# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WAUNYE CALM, BRANDON
GATEWOOD, ISAIAH HARBER,
JYAIRE HENRY, DEWITT JOHNSON,
ZAKEE LLOYD, DENNIS WILLIAMS,
and DEVON YOUNG,

Plaintiffs,

v.

TERRA TAYLOR, in her official capacity
as Commissioner of the Delaware
Department of Correction,

Defendant.

C.A. No. 2026-0576-JTL

## OPINION ADDRESSING THRESHOLD ISSUES

Date Submitted: June 18, 2026
Date Decided: July 17, 2026

Jason H. Beehler, Jared Silberglied, Andrew Bernstein, ACLU OF DELAWARE, Wilmington, Delaware; *Attorneys for Plaintiffs Waunye Calm, Brandon Gatewood, Isaiah Harber, Jyaire Henry, Dewitt Johnson, Zakee Lloyd, Dennis Williams, and Devon Young.*

Joseph S. Naylor, Nicholas E. Skiles, Allison Texter, Robert S. Goldman, Bryan P. Smith, SWARTZ CAMPBELL LLC, Wilmington, Delaware; Jennifer Kate Aaronson, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; *Attorneys for Defendant Terra Taylor, in her official capacity as Commissioner of the Delaware Department of Correction.*

**LASTER, V.C.**

*Oleoresin capsicum* ("OC") is a chemical agent derived from the heat-generating compounds in chili peppers and concentrated to achieve high potency. Exposure to OC causes intense pain. Short-term effects include difficulty breathing, uncontrollable coughing, temporary blindness, and a burning sensation in the eyes and throat and on the skin.

Those attributes make OC an effective non-kinetic weapon. The Delaware Department of Correction (the "Department") uses law-enforcement-grade OC weapons to maintain the safety and security of Delaware prisons.

The plaintiffs are prisoners in the Department's care. They contend that correction officers frequently use OC weapons on prisoners without permitting decontamination, even after they are compliant and any disturbances are under control. They do not challenge the initial use of force. They challenge only the absence of decontamination once they are compliant and the area is secure.

The prisoners contend that an absence of decontamination under those circumstances constitutes a "cruel punishment" that violates Article I, Section 11 of the Delaware Constitution (the "Cruel Punishment Clause"). They have sued the Commissioner of the Department in her official capacity on behalf of a putative class of incarcerated persons in Delaware, defined to include both convicted prisoners and pre-trial detainees. They seek declaratory relief and an injunction barring correction officers from using OC until the Department implements an adequate decontamination policy.

The case moved forward on an expedited basis, and the court has conducted an

evidentiary hearing on the plaintiffs' application for a preliminary injunction. But although the case rapidly moved beyond the pleading stage, the Commissioner has moved to dismiss the complaint as non-justiciable. She argues that the complaint fails to identify a threatened injury sufficient to give the plaintiffs standing to seek injunctive relief. She also contends that the plaintiffs' request for declaratory relief is not yet ripe. And she contends that actions taken after the lawsuit was filed render it moot.

The Commissioner likewise opposes the plaintiffs' application for a preliminary injunction. In addition to arguing that the plaintiffs have not met the standard to obtain injunctive relief, she contends that no private right of action exists under the Cruel Punishment Clause. She also contends that even if one existed, the Cruel Punishment Clause would not afford the plaintiffs any rights beyond what the Eighth Amendment of the U.S. Constitution confers, and Eighth Amendment jurisprudence defeats the plaintiffs' claim.

Those arguments present a mix of issues, some turning on issues of law, and others dependent on the evidence adduced during the preliminary injunction hearing. This decision addresses threshold issues that present issues of law or where the Commissioner seeks dismissal based on the allegations in the plaintiffs' complaint.

This decision holds that the plaintiffs have standing to seek injunctive relief. Under state law, the plaintiffs must have a reasonable apprehension of injury. Federal decisions imposing a higher standard are not controlling. The complaint's allegations satisfy the state law test. When the plaintiffs sued, the Department

lacked any written policy on decontamination, leaving the matter to correction officers' discretion. The complaint's allegations support an inference that correction officers regularly fail to facilitate prisoner decontamination, even after prisoners are compliant and the surrounding area is secure. Several plaintiffs claim to have experienced this problem multiple times. All but two of the plaintiffs filed grievances that resulted in no action being taken. The reasonable-apprehension test is met.

This decision holds that the request for declaratory relief is ripe. When the plaintiffs sued, there was no indication that the Department would address the decontamination issue without judicial intervention. Litigation over the issue was inevitable.

This decision holds that a private right of action exists under the Cruel Punishment Clause that enables the plaintiffs to seek injunctive and declaratory relief. This decision does not reach the more difficult question of whether a violation of the Cruel Punishment Clause could support a damages award.

This decision does not address whether the Cruel Punishment Clause can afford protection beyond what the Eighth Amendment confers. That question is closely tied to the evidentiary showing the plaintiffs must make to obtain a preliminary injunction. This decision also does not reach the fact-laden issues that depend on the evidence presented during the preliminary injunction hearing, such as whether the plaintiffs have made the necessary showing and whether the Commissioner's adoption of a decontamination policy mid-way through this litigation moots the case. The court can only reach those issues after resolving the

Commissioner's threshold arguments. A separate decision addressing those issues will follow promptly.

## I. FACTUAL BACKGROUND

For purposes of the threshold issues that this decision addresses, the facts are drawn from the operative complaint (the "Complaint"), documents it incorporates by reference, and documents subject to judicial notice.[1] For purposes of the threshold issues, the court accepts the Complaint's well-pled allegations as true and draws all reasonable inferences in the plaintiffs' favor.

### A. What Is OC?

OC is a chemical agent derived from capsaicinoids, which are the heat-generating compounds in chili peppers. The potency of a product containing OC can be measured using Scoville Heat Units ("SHU"). The higher the number, the more intense the heat. Ordinary bell peppers have a Scoville heat rating of zero SHU. Jalapeño peppers range from 3,500 to 8,000 SHU. A cayenne pepper falls between 30,000 and 50,000 SHU. A habanero chili pepper weighs in between 200,000 and 350,000 SHU.

A variety of OC weapons exist on the market. Civilian-grade products start at potencies of 500,000 SHU. Law-enforcement-grade products start at potencies of 1 million SHU. Bear spray typically ranges from 2 million to 4 million SHU.

---

[1] Citations in the form "Compl. ¶ __" refer to paragraphs of the Complaint, which is the operative pleading. Dkt. 1. Citations in the form "Ex. __ at __" refer to exhibits to the Complaint. *Id.*

OC contamination can result from direct physical contact, indirect or secondary contact, or area contamination. The effects of OC contamination depend on the potency of the product and the degree of exposure. Serious symptoms typically subside over the course of hours. OC is biodegradable and decomposes naturally. Depending on conditions, it becomes undetectable within days to weeks.

**B.      The Department's OC Weapons**

The Department uses OC weapons when maintaining the safety and security of Delaware prisons. The Department deploys the Level 3 Sabre Red ("Sabre Red") line of products.

On the Scoville scale, Sabre Red has a heat rating of 2 million SHU, the starting potency for bear spray. Another metric for measuring OC potency is major capsaicinoid content ("MCC"), which measures the concentration of heat-producing compounds. Sabre Red has 1.33% MCC, the highest MCC rating that Sabre offers for use on humans. Higher MCC ratings can melt human skin.

Each correction officer receives the Sabre Red MK-2 Trigger Top handheld canister, which contains Sabre Red in aerosol form. The Department stocks other OC weapons containing Sabre Red, including aerosol grenades, sprayable aerosol gel, a high-capacity "Cell Buster" fogger spray, pepper-ball guns, and a 40-millimeter OC "muzzle blast" fired from a launcher.

Sabre Red causes intense pain and a burning sensation in the eyes and throat and on the skin. Other short-term physical effects may include difficulty breathing, uncontrollable coughing, and temporary blindness. Short-term psychological effects

5

may include feelings of suffocation, helplessness, and overwhelming panic. A human exposed to OC may temporarily be unable to hear others.

## C.  Decontamination

Decontamination is the process of removing OC after exposure. Decontamination allows the effects of OC to dissipate as quickly as possible.

OC weapons come with instructions for decontaminating exposed individuals. Sabre Red's manufacturer provides an instructional video—not specifically directed at correctional facilitators or prisoners—that calls for flushing the individual's eyes with fresh water for at least fifteen minutes, using a decontaminating agent several times on the individual's face, then rinsing each eye for another five minutes. The video also suggests applying a soothing solution.

Failing to decontaminate after exposure to OC is dangerous and can be lethal. Significant exposures can result in eye injuries, lung problems, and skin injuries. When sprayed at a close distance, OC can enter eye tissue and skin, causing lacerations. Other possible skin injuries include chemical burns, blisters, and persistent dermatitis. Possible lung injuries include shortness of breath, scarring, and respiratory failure. Effects can be more severe for individuals with health conditions like asthma.

Other jurisdictions have reported deaths due to OC exposure without decontamination. Fortunately, Delaware has not yet faced a lethal OC incident.

## D.  The Department's Use-Of-Force Policy

The Department maintains a use-of-force policy that states:

**POLICY:** The Department recognizes that offenders may at times demonstrate violent and destructive behaviors that may seriously endanger the health and safety of staff, offenders or the public. It is understood that the need to use force occurs most often in situations that are unplanned and unanticipated. Split-second decision-making is often necessary. The Department has adopted the attached Use of Force Model to guide staff in making use of force decisions. The Use of Force Model identifies a graduated approach to the use of force in situations that may be experienced by employees. All employees responsible for offender supervision are trained regarding the Use of Force Model and this policy as a means to reduce and prevent the need to use force and to establish guidelines of reasonableness when force is required.

The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force. The use of force may not be used as a retaliatory or disciplinary measure.

The use-of-force policy encompasses OC weapons but does not address decontamination. The use-of-force policy authorizes using reasonable force to obtain compliance with orders from staff and to "(1) control disruptive or violent offenders, (2) enforce or restore order, (3) defend oneself against unwanted physical contact or harm, (4) protect other persons from imminent death, serious bodily harm, or physical harm, (5) protect state property, (6) prevent escapes or capture escaped/ing inmates, (7) administer non-emergent and emergent involuntary medications prescribed by a qualified health professional and (8) apply clinical or therapeutic restraints authorized by a qualified health professional."[2]

The Department tracks uses of force in its facilities. Every Delaware correction officer carries an MK-2 aerosol canister on their duty belt during shifts. The vast majority of the Department's use-of-force incidents involve OC weapons. On average,

---

[2] Ex. L at 1.

correction officers deploy OC in Delaware prisons around twice per day.

In this lawsuit, the plaintiffs do not challenge any initial decision to use force. They challenge what they claim are frequent failures by correction officers to facilitate decontamination after OC use. The prisoners concede that the safety and security of a facility and its occupants take precedence. They maintain that correction officers fail to permit decontamination after prisoners have become compliant and the area is secure.

## E.    The Department's Training Guidelines

Before this litigation, the Department did not have a written policy on OC decontamination. Correction officers used their own judgment.

Before this litigation, the Department did train correction officers on the use of OC weapons and proper decontamination. Correction officer candidates attending the Department's academy must complete a twelve-week training course that includes a unit on OC. Correction officers must score seventy percent or higher on a written test covering the training.

Historically, the OC training unit at the academy included a presentation titled "OC Aerosols."[3] It instructed correction officers to spray OC from a distance of at least three feet, spray in one-to-two second bursts, and pause and evaluate before spraying more.

---

[3] Ex. A at DOC_SCI_0041428. The Department is currently updating the training materials to reflect its new policy.

The training presentation stated that after using the OC, the officer should "[s]tart decontamination process and have [the exposed person] seen by medical."[4] The presentation instructed officers to "completely" decontaminate exposed individuals.[5]

One of the slides in the presentation underscored the decontamination requirement with bolded, all-caps text and a red skull and crossbones.



The instructor's notes for the slide contain the following additional information:

---

[4] *Id.* at DOC_SCI_0041446.

[5] *Id.* at DOC_SCI_0041455.

Remove contaminated individuals from the area
Start communication
Expose to fresh air
Subject should sit still
Use lots of water
Do not allow the subject to rub their eyes
Use of a wet paper towel followed by a dry paper towel has proven to be an effective way to remove spray from skin.
This should be repeated numerous times.
Contact lenses should not be removed by individuals
EMS units should remove all contacts especially hard contacts
Difficulty in removing the contact lenses may cause scratches to the eye
Hard contacts should be cleaned thoroughly
Soft contacts should be disposed of
Usually individuals will recover within one hour, with eyes opening within 20-30 minutes.
Any individuals not showing improvement should be monitored closely to ensure recovery and medical assistance should be sought after 1 hour.
Any pre-existing medical conditions, such as asthma, respiratory, or eye injuries, should be determined before decontamination begins.

The slide notes direct the instructor to ensure the trainees understand the decontamination guidelines. They also remind the instructor to administer a written test on the material.

After joining the Department, correction officers must periodically attend refresher trainings on various topics, including OC use.

## F.    OC Incidents Without Decontamination

The eight plaintiffs are currently incarcerated in Delaware. They allege that despite the Department's training materials, correction officers regularly fail to facilitate decontamination, even after prisoners are compliant and the area is secure. They allege that the failures to decontaminate have resulted in extreme and persistent pain. All allege having an ongoing fear that they could be subjected to OC weapons at any time, without any reason, without decontamination.

Six of the eight plaintiffs filed grievance reports about their OC incidents. None of the grievances resulted in any change to the Department's practices. A seventh plaintiff was told he had to contact Department investigators first. He contacted the investigators and never received a response.

Plaintiff Dewitt Johnson alleges that correction officers sprayed him with OC on three occasions: once in 2022, a second time on October 22, 2025, and a third time on January 24, 2026. Each time, he was never decontaminated. Instead, he was sent to solitary confinement. After each incident, he was not allowed to shower for at least twenty-four hours. Johnson has asthma and uses an albuterol inhaler daily. After the second and third incidents, he was not given his inhaler. Johnson filed a grievance with the Department, but it was not processed. Johnson contends that each exposure to OC without decontamination resulted in extreme and persistent pain that lasted several days.

Plaintiff Zakee Lloyd alleges that correction officers sprayed him with OC on two occasions, once on March 4, 2024, and a second time in April or May. Each time, he was never decontaminated. After each incident, he was not allowed to shower for at least twenty-four hours. Lloyd continued to feel a burning sensation even after showering. He tried to file a grievance, but he was told he had to contact Department investigators first. He contacted them and never received a response. Lloyd contends that each exposure to OC without decontamination resulted in extreme and persistent pain that lasted several days.

Plaintiff Dennis Williams alleges that correction officers sprayed him with OC on December 12, 2025. He was never decontaminated. Instead, he was sent to solitary confinement. Once there, he tried to decontaminate using water from the sink and toilet, but stopped when the water caused the burning sensation to increase. Williams has asthma. He was allowed two puffs on his inhaler after he was sprayed, then the

11

inhaler was taken away when he was sent to solitary confinement. He was not given his inhaler until several hours after the incident. He also suffers from Crohn's disease. Since the incident, Williams struggles with breathing, his vision is blurred, and he suffers from persistent headaches. Every time he washes his hair or sweats while sleeping, he feels a painful burning sensation. Williams was sprayed in the eyes at point-blank range, and his vision is impaired. He filed grievance reports, which were denied.

Plaintiff Devon Young alleges that correction officers sprayed him with OC on January 30, 2026. Young struggled to breathe and had a panic attack. He was never decontaminated. He was not allowed to shower for at least a day. Young has asthma, and he uses an inhaler daily. After the incident, he asked for his inhaler but was refused. Young has nightmares about the incident and has issues with sleeping, anxiety, and appetite loss. Young filed a grievance and was told that correction officers do not deal with OC issues.

Plaintiff Jyaire Henry alleges that correction officers sprayed him with OC on October 3, 2025. He was never decontaminated. Correction officers took him to his cell, where he tried to remove the OC but stopped when the water increased the burning sensation. Henry was not allowed to shower for at least twenty-four hours. He filed a grievance the next day. After several months, Henry received a response consisting of a single piece of paper with a case number, without any substantive reply. Henry contends that his exposure to OC without decontamination resulted in extreme and persistent pain for at least twenty-four hours.

Plaintiff Isaiah Harber alleges that correction officers sprayed him with OC on December 12, 2025. He was never decontaminated. He was not allowed to shower for two days. He still has trouble breathing. On one occasion, he passed out and was taken to the hospital. Harber has seen medical personnel for his breathing issues, but he has not received any medications or breathing treatments. He suffers from chronic nightmares. Harber filed multiple grievances and received no response.

Plaintiff Brandon Gatewood alleges that correction officers sprayed him with OC in August 2022. He was never decontaminated. He was not allowed to shower for a day. Since then, Gatewood's sense of smell has been greatly diminished, and he can no longer smell food most of the time. The next day, Gatewood filed a grievance, which was dismissed. Gatewood contends that his exposure to OC without decontamination resulted in extreme and persistent pain for twenty-four hours.

Plaintiff Waunye Calm alleges that correction officers sprayed him with OC in November 2025. He was never decontaminated. Instead, correction officers took him to his cell, where he tried to remove the OC with water but stopped when it increased the burning and itching sensation. Calm contends that his exposure to OC without decontamination resulted in extreme and persistent pain that lasted several days. His skin continued to burn and itch for about a week.

Each plaintiff states in an affidavit that in addition to their exposures, they witnessed Delaware correction officers use OC weapons on other prisoners without subsequent decontamination. The parties also refer to affidavits from five non-plaintiff prisoners who aver that correction officers sprayed them with OC without

subsequent decontamination.

The Complaint refers to three federal cases challenging the Department's use of OC weapons. In *Davis v. Neal*, correction officers allegedly sprayed dozens of prisoners who were removed from the contaminated area but not decontaminated.[6] In *Flores v. Emig*, correction officers allegedly used Sabre Red spray, OC grenades, and a pepper-ball launcher on prisoners without subsequent decontamination.[7] In *Cropper v. Parke*, correction officers allegedly fired dozens of OC pepper-ball rounds at a prisoner without subsequent decontamination.[8]

## G.    This Litigation

On May 7, 2026, the plaintiffs filed this putative class action on behalf of all incarcerated persons in Delaware, defined to include both prisoners and pre-trial detainees.[9] They sued Terra Taylor in her official capacity as the Commissioner. Taylor directs all Delaware prison operations, including supervising the use-of-force policy, correction officers' compliance training programs, the grievance procedure, and any measures to discipline correction officers.

---

[6] No. 1:21-cv-1773 (D. Del.).

[7] No. 1:25-cv-100 (D. Del.).

[8] No. 1:25-cv-812 (D. Del.).

[9] *See* Compl. ¶¶ 261, 263 & n.33. All of the named plaintiffs are prisoners, and the Complaint uses that term. This decision follows suit.

The Complaint's lone count asserts that the Department's use of OC on prisoners without decontamination constitutes "cruel punishment" that violates Article I, Section 11 of the Delaware Constitution. In its entirety, that section states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and in the construction of jails a proper regard shall be had to the health of prisoners."[10] The plaintiffs invoke the portion of the clause prohibiting cruel punishments.

The plaintiffs seek only declaratory and injunctive relief, not money damages. They request a declaration that using OC without proper decontamination after a prisoner is compliant and the area is safe violates the Cruel Punishment Clause. They ask for preliminary and permanent injunctions that would enjoin the Department from using OC on prisoners until the Department implements an adequate decontamination policy.

The case proceeded on an expedited basis toward a hearing on the plaintiffs' application for a preliminary injunction. A few weeks after the plaintiffs filed suit, the Department issued DOC Policy No. 8.30B (the "Decontamination Policy").[11] The Decontamination Policy establishes an OC decontamination policy for correction

---

[10] Del. Const. art. I, § 11.

[11] Dkt. 45, Ex. A. The court takes judicial notice of the Decontamination Policy. *See* D.R.E. 201(d) ("The court may take judicial notice at any stage of the proceeding.").

15

officers to follow. The plaintiffs maintain that the Decontamination Policy is inadequate.

On June 10, 2026, the Commissioner moved to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6). She challenged the plaintiffs' standing to seek injunctive relief, argued that the request for a declaratory judgment was unripe, and contended that the Decontamination Policy rendered the lawsuit moot.[12]

Because of the expedited schedule, the parties briefed the plaintiffs' application for a preliminary injunction simultaneously with the Commissioner's motion to dismiss. In opposing the plaintiffs' application, the Commissioner argued that the plaintiffs could not meet the standard for injunctive relief. She also renewed her non-justiciability arguments. In addition, she contended that a private right of action does not exist under the Cruel Punishment Clause. And she argued that even if a private right of action existed, the Cruel Punishment Clause would not afford the plaintiffs any rights beyond what the Eighth Amendment confers, and she relied on Eighth Amendment jurisprudence that she says forecloses the plaintiffs' claim.

The court conducted a hearing on the plaintiffs' application on June 18, 2026. During the hearing, the Commissioner and four other witnesses testified live. The

---

[12] The plaintiffs filed an answering brief on June 16, 2026. Dkt. 52. Under the Court of Chancery Rules, the Commissioner was permitted but not required to file a reply brief. *See* Ct. Ch. R. 7(c)(1) ("Except as the Court orders, only the following briefs *may* be filed: (A) an opening, answering, and reply brief for a motion under Rule 12 . . . ." (emphasis added)). The Commissioner did not file a reply brief.

parties introduced depositions, affidavits, documents, photographs, and videos into evidence. The parties also presented argument.

The procedural posture of the case resulted in a mixture of legal and fact-laden issues, distributed across the parties' various submissions. Some of the arguments present issues of law. Some attack the Complaint. Some turn on the evidence submitted during the preliminary injunction hearing.

This decision addresses the threshold issues that either present questions of law or attack the Complaint. Those issues are (1) whether the plaintiffs have standing to seek injunctive relief, (2) whether the request for a declaratory judgment is ripe, and (3) whether a private right of action exists under the Cruel Punishment Clause.

The court will issue a separate decision addressing the issues that turn on post-pleading events and the evidence submitted during the preliminary injunction stage. Those issues include whether the Decontamination Policy rendered the action moot and whether the plaintiffs established an entitlement to a preliminary injunction.

## II.   STANDING TO SEEK INJUNCTIVE RELIEF

The first issue is whether the plaintiffs have standing to seek injunctive relief. Standing is a "threshold issue" that a court should resolve at the outset, whenever possible, before reaching the merits.[13]

"The term 'standing' refers to the right of a party to invoke the jurisdiction of

---

[13] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016).

a court to enforce a claim or to redress a grievance."[14] Standing is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[15] In state court, standing does not implicate the court's power to hear a particular claim. It asks whether a particular party can assert it and whether the court—as a discretionary matter—should decline to proceed.

Standing is an aspect of justiciability.[16] Courts use standing and other justiciability doctrines to determine "whether a case is properly suited for resolution."[17] A court can invoke a standing doctrine when it would be improvident to address a claim that the court otherwise would have subject matter jurisdiction to entertain.[18] When ruling on a justiciability issue, a court assumes that the underlying claim is valid and asks whether the court should nevertheless forego hearing it.[19]

---

[14] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (citing *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

[15] *Stuart Kingston*, 596 A.2d at 1382.

[16] *Emps. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 607 (Del. 2024) (identifying "[t]he four aspects of justiciability" as "standing, mootness, ripeness, and political question").

[17] *Id.* (internal quotation marks omitted).

[18] *See Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 341–42 (Del. Ch. 2023), *aff'd sub nom. CSC Upshot Ventures I, L.P. v. Gandhi-Kapoor*, 326 A.3d 369 (Del. 2024).

[19] *W. Palm Beach Firefighters' Pens. Fund v. Moelis & Co.*, 310 A.3d 985, 991 (Del. Ch. 2024), *rev'd on other grounds*, — A.3d —, 2026 WL 184868 (Del. Jan. 20, 2026).

## A. The Proper Procedural Rule

The Commissioner has styled her motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6). Rule 12(b)(1) authorizes a party to move to dismiss a claim for "lack of subject-matter jurisdiction."[20] Rule 12(b)(6) authorizes a party to move to dismiss a claim for "failure to state a claim upon which relief can be granted."[21] For purposes of the pleading-stage issues that this decision addresses, there is no difference between the rules. The court must accept the Complaint's well-pled allegations as true, give the plaintiffs the benefit of all reasonable inferences, and consider documents that the Complaint incorporates by reference plus information subject to judicial notice.

## B. The Reasonable-Apprehension Test

The plaintiffs seek injunctive relief. The Commissioner challenges their standing to seek that form of relief. The Commissioner relies heavily on federal law, but federal standing doctrine does not bind state courts. Under Delaware law, the plaintiffs have standing to sue.

Federal courts have developed an extensive body of standing jurisprudence because Article III of the U.S. Constitution limits the scope of federal judicial power to "Cases" and "Controversies."[22] Citing federal authority, the Commissioner argues

---

[20] Ct. Ch. R. 12(b)(1).

[21] Ct. Ch. R. 12(b)(6).

[22] U.S. Const. art. III, § 2, cl. 1.

that when a plaintiff cites incidents of past wrongs and seeks an injunction against future incidents, the plaintiff must point to "a real and immediate threat of repeated injury"[23] and that the threatened injury is "certainly impending."[24]

This court has developed a similar but more flexible standard for determining when a plaintiff can seek injunctive relief against a recurrence of past injury. That inquiry is all the more necessary here than in federal court because of the nature of this court's jurisdiction. As a Court of Equity, this court "can acquire subject matter jurisdiction in the first instance by three different means: (1) the invocation of an equitable right; (2) a request for an equitable remedy when there is no adequate remedy at law; or (3) a statutory delegation of subject matter jurisdiction."[25] When a party seeks to ground jurisdiction on the need for an equitable remedy,

> a judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery.[26]

A court likewise takes a practical view when a plaintiff seeks to ground jurisdiction

---

[23] *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted).

[24] *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (internal quotation marks omitted).

[25] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973 (Del. Ch. 2016) (internal quotation marks omitted).

[26] *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991).

20

on a request for injunctive relief.

As framed by Chancellor Allen, "for a complaint to properly state a claim cognizable in equity solely because of a request for an injunction, the facts alleged must, if assumed to be true, create a reasonable apprehension of a future wrong."[27] The reasonable-apprehension test balances two competing considerations. On the one hand, injunctions against future wrongdoing are generally unavailable.[28] Instead, the court presumes "that parties will respect any decision rendered by any competent court of this State."[29] And that is particularly true where government action is concerned, such that "[p]rospective injunctive relief is generally unavailable where the plaintiff's proposed injunction merely seeks to prospectively compel a government to conform with the interpretation of the law reflected in the proposed declaratory judgment."[30]

On the other hand, "[s]imple cessation of an actionably wrongful activity does not remove this Court's ability to grant injunctive relief. Injunctive relief is obviously

---

[27] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 606 (Del. Ch. 1987) (Allen, C.).

[28] *Mock v. Div. of State Police, Dep't of Safety & Homeland Sec.*, 2022 WL 1744439, at \*10 (Del. Ch. May 31, 2022); *Preston Hollow Cap. LLC v. Nuveen LLC*, 216 A.3d 1, 10–11 (Del. Ch. 2019); *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 114 (Del. Ch. 2017).

[29] *Young v. Red Clay Consol. Sch. Dist.*, 2017 WL 2271390, at \*53 (Del. Ch. May 24, 2017) (alteration and internal quotation marks omitted).

[30] *Crown Castle Fiber LLC v. City of Wilm.*, 2021 WL 2838425, at \*5 (Del. Ch. July 8, 2021).

prospective in nature, focusing on what the defendant is likely to do in the future."[31]

"[W]here there is reason to believe that a defendant will resume his wrongful course of conduct," a court may issue a permanent injunction.[32] A plaintiff must also establish "a reasonable apprehension of risk of future breaches of duty of a predictable type."[33] An unsupported, subjective concern about a future harm is insufficient to meet this test. "This court cannot permit its jurisdiction to be invoked simply on the basis of unsubstantiated fear that a legal duty may be breached in an uncertain future."[34]

Delaware's reasonable-apprehension test is more flexible than the federal requirements of a real and immediate threat of repeated injury that is certainly impending. "Delaware courts are not bound by the federal rules of justiciability."[35] "Unlike the federal courts . . . , state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties

---

[31] *Weiner v. Miller*, 1990 WL 54915, at *1 (Del. Ch. Apr. 27, 1990).

[32] *Id.*

[33] *Thorpe v. CERBCO, Inc.*, 1996 WL 560173, at *4 (Del. Ch. Sept. 13, 1996) (Allen, C.).

[34] *State v. Pettinaro Enters.*, 870 A.2d 513, 536 (Del. Ch. 2005).

[35] *Albence v. Higgin*, 295 A.3d 1065, 1086 (Del. 2022) (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability[.]")).

22

who are 'mere intermeddlers.'"[36]

That said, Delaware courts often look to federal precedent as persuasive authority on standing issues,[37] and the Delaware Supreme Court has noted that the standards for evaluating standing under federal law "are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware."[38] But "[b]ased on the structure of our cooperative federal system, state court standing doctrine is appropriately more flexible than federal standing doctrine, because the state courts play a different and more expansive role than the federal courts."[39] "[T]he authority of our [state] courts is derived from the plenary and

---

[36] *Dover Hist. Soc'y*, 838 A.2d at 1111 (quoting *Stuart Kingston*, 596 A.2d at 1382); *accord Gandhi-Kapoor*, 307 A.3d at 341. *See generally Reeder v. Wagner*, 974 A.2d 858, 2009 WL 1525945, at *2 (Del. June 2, 2009) (TABLE) (affirming dismissal for lack of taxpayer standing in action seeking "declaratory relief aris[ing] from [plaintiffs'] rights, as taxpayers, to challenge the allegedly illegal disbursement of State funds" because "plaintiffs were not seeking to enjoin the misuse of public money or lands [and] [i]nstead, they were seeking an advisory opinion from the Superior Court reflecting their interpretation of certain statutes and to compel Auditor Wagner to perform his discretionary audit functions in a particular way" (emphasis omitted)).

[37] *Emps. Ins*, 312 A.3d at 608 ("We generally follow Article III's standing requirements.").

[38] *Dover Hist. Soc'y*, 838 A.2d at 1111.

[39] *In re Del. Pub. Schs. Litig.*, 239 A.3d 451, 510 (Del. Ch. 2020) (citing John DiManno, *Beyond Taxpayers' Suits: Public Interest Standing in the States*, 41 Conn. L. Rev. 639, 658–63 (2008) (collecting authorities)).

unenumerated powers of state sovereignty."[40] "'State courts need not become enmeshed in the federal complexities and technicalities involving standing and are free to reject procedural frustrations in favor of just and expeditious determination on the ultimate merits.'"[41] In short, "[s]tanding doctrine in the state courts is predominantly discretionary and prudential,"[42] and "Delaware's courts may hear cases and controversies that the federal courts cannot."[43]

## C.  Applying The Reasonable-Apprehension Test

The Complaint pleads facts supporting an inference that the plaintiffs have a reasonable apprehension of future harm. The Complaint's allegations sufficiently allege that correction officers will use OC weapons on the plaintiffs and similarly situated prisoners without adequate decontamination. The Complaint's supporting allegations are specific, detailed, and lengthy:

- Every Department correction officer carries an MK-2 aerosol canister as part of their standard gear.

- Department correction officers have other OC weapons at their disposal, including OC area foggers, pepper-ball guns, 40-millimeter OC rounds, and OC grenades.

---

[40] *Higgin*, 295 A.3d at 1086–87 (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 469–72 (2018)).

[41] Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 Harv. L. Rev. 1833, 1857 (2001) (quoting *State v. Sheward*, 715 N.E.2d 1062, 1081–82 (Ohio 1999) (quoting 59 Am. Jur. 2d Parties § 30 (1987))).

[42] *Del. Pub. Schs.*, 239 A.3d at 510.

[43] *Higgin*, 295 A.3d at 1086–87.

- Department correction officers commonly use OC spray to secure compliance and maintain safety and security at Delaware prisons.

- Department correction officers are involved in approximately 550 use-of-force incidents each year, or approximately two per day.

- The vast majority of use-of-force incidents involve OC weapons, meaning Department correction officers use OC weapons on prisoners hundreds of times each year.

- In addition to direct exposure, prisoners are often contaminated through indirect exposure as bystanders.

- None of the eight plaintiffs or five non-plaintiff affiants were decontaminated.

- None of the plaintiffs in the *Davis*, *Flores*, and *Cropper* cases were decontaminated.

- Several of the plaintiffs and other affiants were sprayed on more than one occasion.

- Many plaintiffs in the *Davis* and *Flores* cases were sprayed on more than one occasion.

- All but two of the plaintiffs filed grievances that resulted in no action being taken.

- When the Complaint was filed, the Department did not have a written policy addressing decontamination.

- The lack of decontamination occurred despite correction officer candidates receiving training on the importance of decontamination.

- The lack of decontamination occurred despite OC product labels calling for decontamination.

- Several of the plaintiffs and other affiants have health conditions that make a lack of decontamination particularly risky.

Based on these allegations, the plaintiffs have a reasonable apprehension that they will be sprayed with OC in the future and not permitted to decontaminate.

### 1. Math

The Commissioner responds that the plaintiffs' fear of future harm relies on a

speculative chain of improbable events. Inspired by federal precedent, she crunches numbers to argue that it is improbable that the named plaintiffs will be exposed to OC without decontamination again. She reasons as follows:

- The Department cares for around 4,500 prisoners.

- There are around 550 incidents involving OC weapons each year.

- Only around 12% of prisoners are exposed to OC each year.

- On average, a typical prisoner should be exposed only once every eight years.

- At 550 exposures per year, there were likely around 3,000 exposures since 2020, yet the plaintiffs have presented only twenty-three instances of deficient decontamination.

- The absence of more complaints about decontamination suggests that more than 99% of Delaware prisoners "were decontaminated to their satisfaction."[44]

- A typical prisoner is therefore highly unlikely to encounter deficient decontamination.

The math is clever, but unpersuasive.

First, the fact that the Complaint describes twenty-three incidents does not mean that more did not occur. That means that those are the prisoners who have come forward and been willing to participate in this lawsuit. Inferring that no other prisoners have suffered deficient decontamination would necessitate drawing a defense-friendly inference.

Second, the plaintiffs seek to sue on behalf of a putative class comprising all individuals incarcerated in Delaware. "The class-action device was designed as an

---

[44] Dkt. 45 at 35.

exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[45] Its purpose is to enable a court "to hear an action by or against representatives of a group if plaintiff could establish that the number of people involved was so large as to make joinder impossible or impracticable, that all the members of the group possessed a joint interest in the question to be adjudicated, and that the named parties adequately represented those absent from the action."[46] When "members of the class have repeatedly suffered personal injuries in the past that can fairly be traced to the [defendant's] standard practices, the defendant's treatment of the class as a whole must be considered."[47] Here, the twenty-three incidents provide specific examples to support the Complaint's broader allegations about a practice of deficient decontamination that affects the class as a whole. The Complaint expressly alleges that those incidents are "examples [that] are not outliers" and that "illustrat[e] [the Department's] widespread practice."[48]

---

[45] *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (internal quotation marks omitted).

[46] 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1751 (4th ed.), Westlaw (database updated Apr. 2026).

[47] *Armstrong v. Davis*, 275 F.3d 849, 864 (9th Cir. 2001) (alteration in original) (internal quotation marks omitted), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005); *see generally Gen. Tel. Co. of Sw.*, 457 U.S. at 156 ("We have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks omitted)).

[48] Compl. ¶ 222 ("The incidents involving the named Plaintiffs are just eight examples detailing how Delaware correctional officials deploy OC against prisoners

Third, relying on calculations of this sort to predict whether a plaintiff faces a threat of future harm tilts the scales against judicial intervention to address allegedly unconstitutional but uncommon acts. The Commissioner relies on *Flores*, which was "informed by the Supreme Court's decision in *Lyons*."[49] In *Lyons*, the plaintiff claimed police officers used a chokehold on him during a police traffic stop that rendered him unconscious, violating his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. He sought to enjoin the Los Angeles police's future use of chokeholds. The Supreme Court of the United States reasoned that "to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner."[50] The Court thought that "the odds" that Lyons would be stopped

without subsequently decontaminating them—in violation of [Department] policy and training requirements. The Plaintiffs' examples are not outliers. As discussed below, recent excessive force lawsuits filed in the U.S. District Court for the District of Delaware have revealed further examples illustrating [the Department]'s widespread practice.").

[49] *Flores v. Emig*, 2025 WL 2432089, at *3 (D. Del. Aug. 22, 2025) (citing *Lyons*, 461 U.S. 95), *aff'd*, 2026 WL 1747001 (3d Cir. June 17, 2026).

[50] *Lyons*, 461 U.S. at 105–06 (emphasis in original).

and subjected to a chokehold without provocation were insufficient to confer federal standing for equitable relief.[51]

In dissent, Justice Marshall lamented that the majority's decision "immunizes from prospective equitable relief any policy that authorizes persistent deprivations of constitutional rights as long as no individual can establish with substantial certainty that he will be injured, or injured again, in the future."[52] Justice Marshall questioned the majority's probabilistic reasoning by noting that, "[u]nder the view expressed by the majority today, if the police adopt . . . a policy of shooting one out of ten suspects, the federal courts will be powerless to enjoin its continuation."[53] Justice Marshall's "one-in-ten" hypothetical illustrates how calculations of this sort can prevent a court from addressing significant but uncommon harms.

Using probabilistic calculations also suffers from a deeper flaw: It flouts the principle that constitutional rights protect the minority from the tyranny of the

---

[51] *Id.* at 108 (quoting *Lyons v. City of Los Angeles*, 615 F.2d 1243, 1246–47 (9th Cir. 1980) ("Certainly the odds of having that sort of encounter are much greater than the odds of having the sort of encounters described in *O'Shea* or in *Rizzo*, and therefore meet the constitutional requirements of 'case' or 'controversy.'")); *see id.* ("[I]t is untenable to assert . . . that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped."); *id.* ("[I]t is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse.").

[52] *Id.* at 137 (Marshall, J., dissenting).

[53] *Id.* (Marshall, J., dissenting).

majority. In the Federalist Papers, Madison warned about the danger of a majority faction advancing its agenda at the expense of the minority's rights.[54] He stressed that "[i]t is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part. Different interests necessarily exist in different classes of citizens. If a majority be united by a common interest, the rights of the minority will be insecure."[55]

Mathematical discounting like the Commissioner's calculations uses the minority's smaller size to reduce their access to justice. As the size of the minority decreases and the need for constitutional protection increases, the discounting model makes it all the less likely that a minority can seek relief. The Commissioner's probabilistic calculations run contrary to the purpose of counter-majoritarian constitutional rights. They do not defeat an inference that the plaintiffs have a reasonable apprehension of future harm.

---

[54] The Federalist No. 10 (James Madison) ("Complaints are everywhere heard . . . that measures are too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority."); *id.* ("When a majority is included in a faction, the form of popular government . . . enables it to sacrifice to its ruling passion or interest both the public good and the rights of other citizens."). *See also* Robert M. Cover, *The Origins of Judicial Activism in the Protection of Minorities*, 91 Yale L.J. 1287, 1297 (1982) ("[A] discrete and insular minority cannot expect majoritarian politics to protect its members as it protects others.").

[55] The Federalist No. 51 (James Madison).

## 2. The Decontamination Policy

Next, the Commissioner argues that the Decontamination Policy minimizes or eliminates the likelihood of future deficient decontamination. That is a mootness argument, and it depends on the facts developed during the evidentiary hearing held in conjunction with the plaintiffs' application for a preliminary injunction. The court will address it in that context.

When considering the type of pleading-stage motion that the Commissioner initially made, courts evaluate standing at the time the complaint was filed.[56] When the Complaint was filed, the Department did not have a written decontamination policy. Correction officers used their discretion.

## 3. *Flores*

Continuing her reliance on federal standing doctrine, the Commissioner cites *Flores*, where the United States District Court for the District of Delaware (the "Delaware District Court") held that Delaware prisoners lacked standing to seek injunctive relief against future harm. There, six prisoners alleged that, on September 5, 2024, the Department's correctional emergency response team "began a shakedown of the Plaintiffs' cells . . . [where they] pepper-sprayed, punched, beat, kicked, sexually

---

[56] *Schoon v. Smith*, 953 A.2d 196, 200 (Del. 2008) ("Standing is the requisite interest that must exist in the outcome of the litigation at the time the action is commenced." (quoting *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997))).

assaulted, degraded, and humiliated Plaintiffs."[57] The plaintiffs argued that the correction officers used excessive force in violation of the Eighth and Fourteenth Amendments, and they asked the Delaware District Court to enjoin the Department from (i) deploying the emergency team without first providing a written statement explaining the nature of the emergency, (ii) using pepper grenades in any individual cell, (iii) using pepper spray against prisoners when closer than three feet away, (iv) leaving sprayed individuals in locked cells or rooms without allowing them to decontaminate, and (v) deploying the emergency team in any arbitrary, unprovoked, or punitive manner.[58]

The defendants argued that the *Flores* complaint contained only conclusory allegations that could not support any constitutional violations.[59] The Delaware District Court dismissed eleven defendants based on the complaint's failure to allege that they were personally involved in the incident, but otherwise denied the motions to dismiss.[60] Two months later, the Delaware District Court denied the plaintiffs' motion for a preliminary injunction, holding that the plaintiffs lacked Article III standing to seek injunctive relief because they had not "made a clear showing that

---

[57] *Flores*, 2025 WL 2432089, at *1.

[58] *Id.* at *1–2.

[59] *Flores v. Emig*, 2025 WL 1638366, at *3–4 (D. Del. June 9, 2025).

[60] *Id.* at *3.

they are likely to suffer a future injury."[61] Although the plaintiffs alleged that future shakedowns were likely, the Delaware District Court rejected that allegation as insufficient under the federal test.[62] The Delaware District Court also held that even if a shakedown occurred, it was not sufficiently likely that the allegedly unconstitutional conduct would occur again.[63] The United States Court of Appeals for the Third Circuit affirmed, holding that the complaint's allegations were not sufficient to show that future harm was "'*certainly impending*, or there [was] a *substantial risk* that the harm will occur,'" quoting its standard for standing involving prospective relief.[64]

*Flores* does not warrant dismissal of this case. First, the Commissioner seeks dismissal on the pleadings, the same motion that the Delaware District Court denied.[65] Second, at the preliminary injunction stage, the Delaware District Court

---

[61] *Flores*, 2025 WL 2432089, at *3.

[62] *Id.* at *4.

[63] *Id.* at *5.

[64] *Flores v. Emig*, 2026 WL 1747001, at *1 (3d Cir. June 17, 2026) (alteration and emphasis in original) (quoting *Rd.-Con, Inc. v. City of Phila.*, 120 F.4th 346, 355 (3d Cir. 2024)).

[65] That denial applied the federal "plausibility" pleading standard, which is higher than Delaware's "reasonable conceivability" standard. *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 n.13 (Del. 2011) ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"). The Delaware District Court's denial of a motion to dismiss under the

applied the higher federal standard, not Delaware's reasonable-apprehension test. Third, the Complaint here rests on specific, detailed, and lengthy allegations about multiple incidents, not a single incident.

In any event, the plaintiffs adequately plead that they have suffered repeated, prolonged exposure to OC without decontamination, resulting in extreme and persistent pain and long-term health impairments. Based on their alleged past injuries, the Complaint's broader allegations about the Department's failure to decontaminate Delaware prisoners, and their fear of future injury from the Department's failure to decontaminate, the plaintiffs have standing to sue.

### 4. Federal Cases On OC Exposure

Finally, the Commissioner asserts that under the Eighth Amendment, "numerous federal courts have noted that most inmate complaints of deficient decontamination do not rise to the level of a constitutionally recognized injury."[66] According to the Commissioner, that means that even if the plaintiffs were exposed to OC and not allowed to decontaminate, they would lack standing for want of a constitutionally sufficient injury.[67]

In reality, federal decisions are split on this issue. A series of decisions have

---

higher standard makes it all the more appropriate to deny the current motion to dismiss under Delaware's lower standard.

[66] Dkt. 45 at 28.

[67] *Id.* at 28–29.

34

held that a failure to decontaminate can give rise to a claim under the Eighth

Amendment.[68] Often those decisions involve claims for money damages, so federal

[68] *See, e.g.*, *Walker v. Bowersox*, 526 F.3d 1186, 1189–90 (8th Cir. 2008) (reversing grant of summary judgment to defendant on an Eighth Amendment excessive force claim where the plaintiff "was not allowed to shower or have clean clothes or bedding for three days and could only wash in his cell sink, he suffered red, peeling, and itchy skin for a long time, and had to use hydrocortisone cream for months"); *Norton v. City of Marietta*, 432 F.3d 1145, 1154 (10th Cir. 2005) (reversing grant of summary judgment to defendants on an Eighth Amendment excessive force claim where whether OC use was unconstitutional "turns in part on how long plaintiff was sprayed and whether he was adequately irrigated afterwards or left to suffer unnecessarily"); *Clement v. Gomez*, 298 F.3d 898, 901–05 (9th Cir. 2002) (affirming denial of defendants' motion for summary judgment on Eighth Amendment deliberate indifference claim where officials "may have been deliberately indifferent to the prisoners' serious medical needs if, in fact, they were aware of the harmful effects of the pepper spray and of the inadequacy of their ventilation methods and yet purposefully refused to provide showers, medical care, or combative instructions or to develop an adequate policy to address obvious risks"); *Foulk v. Charrier*, 262 F.3d 687, 692, 701–02 (8th Cir. 2001) ("Foulk testified that, because he received no medical care and had no ability to wash off the pepper spray, he continued to feel its painful effects for several days. . . . [A] reasonable jury could have concluded that [the officer] acted maliciously, sadistically, and with the intent to cause injury . . . . [A] malicious and sadistic use of force by a prison official against a prisoner, done with the intent to injure and causing actual injury, is enough to establish a violation of the Eighth Amendment's cruel and unusual punishment clause."); *Bomar v. Wetzel*, 2020 WL 907641, at *5 (W.D. Pa. Feb. 3, 2020) ("While Plaintiff has not alleged that he suffered any lasting or continuing problems as a result of the OC spray, courts have held that the failure to decontaminate prisoners or otherwise provide medical treatment for prisoners exposed to pepper spray can support a claim for a violation of the Eighth Amendment where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." (internal quotation marks omitted)), *report and recommendation adopted*, 2020 WL 906720 (W.D. Pa. Feb. 25, 2020); *Murray v. Lilly*, 426 F. Supp. 3d 245, 254 (S.D. W. Va. 2019) ("[D]epriving a prisoner of a proper opportunity to fully decontaminate, including forcing them to remain in their contaminated clothes, demonstrates maliciousness and qualifies as excessive force."); *Wagner v. Warden*, 2016 WL 7178297, at *9–10 (D. Md. Dec. 8, 2016) ("Wagner claims he was denied the opportunity to wash off the pepper spray by way of a shower or at a sink. If the pepper spray were allowed to persist after the need for it had expired, then there would be a colorable Eighth

immunity doctrines play a major role in the outcome. At present, it is simply not accurate to describe federal cases as holding that OC exposure without decontamination cannot give rise to a constitutional injury under the Eighth Amendment. Cases interpreting the Eighth Amendment do not provide a basis to dismiss this action on the pleadings for lack of standing.

## III.    THE RIPENESS OF A DECLARATORY JUDGMENT

Having attempted to defeat the plaintiffs' request for injunctive relief with standing, the Commissioner invokes a different justiciability argument to defeat the plaintiffs' request for a declaratory judgment. This time, the Commissioner argues ripeness. That effort does not succeed either.

The Delaware Declaratory Judgment Act grants Delaware courts the power to issue declaratory judgments.[69] Delaware courts can "declare rights, status and other

---

Amendment claim for infliction of harm to plaintiff without adequate justification. . . . Courts have also concluded that the Eighth Amendment can be violated when, after a prisoner is subjected to pepper spray, even for a legitimate reason, officers then withhold appropriate medical attention."); *Thomas v. McNeil*, 2009 WL 64616, at \*23 (M.D. Fla. Jan. 9, 2009) ("[E]ven where chemical agents are permissibly used, when the effects are longer lasting or exacerbated by prolonged exposure, inadequate decontamination, or poor ventilation—something beyond the immediate short term effects of being sprayed with the chemical agent—the use of chemical agents may pose an unreasonable risk to an inmate's health that is serious enough to trigger inquiry under the Eighth Amendment."), *aff'd sub nom. Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010).

[69] 10 *Del. C.* §§ 6501–6513. *See also Gannett Co., Inc. v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003) (explaining that to issue a declaratory judgment, there must be an "actual controversy" meeting the following prerequisites: "(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which

legal relations whether or not further relief is or could be claimed."[70] The Declaratory

Judgment Act's stated purpose is "'to afford relief from uncertainty and insecurity

with respect to [a party's] rights.'"[71]

A Delaware court should only issue a declaratory judgment when the dispute

is sufficiently concrete and mature.[72] "The grant of declaratory judgment is always

discretionary; and before a court should declare the rights of parties in a dispute, it

must not only be convinced that litigation sooner or later appears to be unavoidable,

but also that the material facts are static and that the rights of the parties are

presently defined rather than future or contingent."[73] "The underlying purpose of that

principle is to conserve limited judicial resources and to avoid rendering a legally

binding decision that could result in premature and possibly unsound lawmaking."[74]

At bottom, evaluating ripeness calls for "a common sense assessment of

whether the interests of the party seeking immediate relief outweigh the concerns of

---

the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination." (internal quotation marks omitted)).

[70] 10 *Del. C.* § 6501.

[71] *Brooks v. Lynch*, 2016 WL 5957674, at *2 (Del. 2016) (alteration in original) (quoting 10 *Del. C.* § 6512).

[72] *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1216–17 (Del. 2014).

[73] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 481 (Del. 1989) (internal quotation marks omitted).

[74] *XL Specialty*, 93 A.3d at 1217.

the court 'in postponing review until the question arises in some more concrete and final form.'"[75] "In determining whether an action is ripe for judicial determination, a practical judgment is required."[76]

The plaintiffs' declaratory judgment claim is ripe. They seek a ruling that failing to allow prisoners to decontaminate after they are compliant and the area is safe violates the Cruel Punishment Clause. At the pleading stage, the plaintiffs have sufficiently alleged that deficient decontamination under those circumstances has happened and continues to happen. They contend that they have filed grievances that have not resulted in any action.

The declaration the plaintiffs seek presents a precise issue, capable of resolution. The plaintiffs are not challenging the initial use of OC, which is a discretion-laden decision that depends on the facts. The plaintiffs are not asking the court to rule on what it means for a prisoner to be compliant or for the area to be safe, questions that also require judgment and factual analysis. The plaintiffs are only asking the court to address a narrow issue: After a prisoner is compliant and the area is safe, does a lack of decontamination violate the Cruel Punishment Clause?

The Commissioner argues that the plaintiffs have not linked their request for declaratory relief to any specific actor, but they have. The Complaint contends that the Department lacks an adequate decontamination policy. When the Complaint was

---

[75] *Id.* (quoting *Stroud*, 552 A.2d at 480).

[76] *Stroud*, 552 A.2d at 480 (internal quotation marks omitted).

filed, the Department admittedly lacked any written decontamination policy, and the Commissioner left decontamination to the discretion of correction officers, without guidance. The Department, the Commissioner, and the correction officers are the actors. The Commissioner embodies the Department in her official capacity.

The Commissioner quibbles with the precise wording of the Complaint's prayer for relief, but what the plaintiffs seek is clear. They want a ruling on whether a lack of decontamination, after a prisoner is compliant and the area is safe, violates the Cruel Punishment Clause. If the plaintiffs fail, then the Commissioner and the Department will have certainty on that legal issue. If the plaintiffs prevail, then the principle will be established, and the Commissioner and the Department again will have certainty.

The Commissioner points out that federal courts have consistently refused to declare that every failure to decontaminate prisoners within a particular time frame or in a particular manner constitutes cruel and unusual punishment under the federal Eighth Amendment. That is a merits argument, not a ripeness issue. It also recasts what the plaintiffs are requesting. They do not want a fixed set of rules imposing particular time frames and procedural requirements. They want to use the facts of their cases to establish a principle. If they prevail, then judgment will be required when applying that principle to future situations. If there are as-applied challenges in the future that invoke the principle, then courts will approach those cases with appropriate deference to the correction officers and other Department personnel who must make difficult decisions in real time and under uncertain

39

conditions.

The Commissioner further complains that the plaintiffs have not specified whether they want a declaration about past, present, or future conduct. Once again, the plaintiffs seek a declaratory judgment, based on the specific factual circumstances that they have experienced, that establishes a legal principle. The resulting judgment would do two things. It would declare the rights of the parties in this case and establish a legal principle going forward.

A declaratory judgment would not mean that a plaintiff could turn around and use it to seek money damages. Many hurdles would remain. First, a plaintiff would have to establish that a violation of the Cruel Punishment Clause can support a claim for money damages. As discussed below, this case does not reach that issue because the plaintiffs are only seeking injunctive and declaratory relief. Second, the plaintiff would have to navigate immunity defenses under the Delaware Tort Claims Act.[77] Third, any defendants might well argue for other immunities or raise other defenses to liability, and the plaintiff would have to overcome those as well.

Last, the Commissioner observes that declaratory relief is available only "where no other remedy exists."[78] She claims that the plaintiffs' past injuries can be remedied by money damages, rendering declaratory relief unwarranted. To the contrary, no court has held that money damages are available for a violation of the

---

[77] *See* 10 *Del. C.* § 4001.

[78] *Brooks*, 2016 WL 5957674, at *2.

40

Cruel Punishment Clause. Absent such a holding, the Delaware Tort Claims Act bars their recovery. And even if a court crossed that bridge, the Delaware Tort Claims Act remains a powerful defense, as do other potential bases for immunity that a defendant could invoke. That is precisely why the plaintiffs seek injunctive and declaratory relief.

The plaintiffs' request for declaratory relief is ripe.

## IV.    A PRIVATE RIGHT OF ACTION

In her most sweeping argument, the Commissioner contends that there is no private right of action to enforce the Cruel Punishment Clause, depriving the plaintiffs and everyone else of their ability to enforce that constitutional guarantee. Whether a private right of action exists to enforce the Cruel Punishment Clause presents a difficult issue. First, the Delaware Supreme Court has never established a test for determining whether to recognize a private right of action under a constitutional provision. Second, there is considerable uncertainty about how the Delaware Supreme Court would weigh the factors in any test and what conclusion it would reach. Third, there is a line of existing cases that have held, after abbreviated analysis, that the Cruel Punishment Clause does not support a private right of action for money damages. The Commissioner has tried to cite those authorities as supporting the broader assertion that no private right of action exists to enforce the Cruel Punishment Clause at all.

This decision surveys the tests that have been used to determine whether to recognize a private right of action to enforce a constitutional provision. This decision

concludes that under the principles those tests articulate, a private right of action to enforce the Cruel Punishment Clause exists. That conclusion is sufficient to enable the plaintiffs to pursue their requests for injunctive and declaratory relief. This decision does not reach the more difficult question of whether the Cruel Punishment Clause supports a private right of action for money damages.

## A.     Tests For Recognizing A Private Right Of Action

As demonstrated in the next section, many parties have brought suit to enforce provisions in the Delaware Constitution. The Delaware Supreme Court has ruled in those cases without questioning whether a private right of action existed.[79] Because the justices have not confronted the issue, they have never established a test for determining when a private right arises. Other authorities, however, suggest tests.

### 1.     Delaware Trial-Level Authority

Without guidance from the Delaware Supreme Court, the next place to turn is trial-court authorities. Only three Delaware state court decisions squarely address the existence of private rights of action under the Delaware Constitution. None establish a test, but it is possible to reverse-engineer the test they implicitly applied.

---

[79] The one time the question of a private right of action was presented on appeal, it had not been raised below and was deemed waived. *In re COVID-Related Restrictions on Religious Servs.*, 326 A.3d 626, 645 n.144 (Del. 2024) ("On appeal, Appellee argued for the first time that Plaintiffs do not have a private right of action for claims arising under the Delaware Constitution. We reject this argument without reaching its merits because it was not raised below. The argument is precluded by Rule 8 of this Court, which provides that arguments not fairly presented to the trial court will not be considered by this Court." (citation omitted)).

The first decision—*Schueller*—addressed a plaintiff's effort to sue a state trooper for money damages for allegedly violating Article I, Section 6 of the Delaware Constitution.[80] In a brief order, the court declined to recognize a private right of action for damages under that provision.[81] *Schueller* gave the following four reasons:

(i) Mr. Schueller has alternative remedies available to him through a common law tort action for battery or gross negligence, both of which allow Mr. Schueller the opportunity to recover damages for the unlawful or excessive use of force, and Mr. Schueller has brought these common law tort claims against Defendants,

(ii) unlike *Bivens*, there is no state statute similar to section 1983 of the Civil Rights Act that already exists to define the scope of this new cause of action and its limits,

(iii) creating a new cause of action under Article I, Section 6, which does not mention excessive force or the requirements for bringing such a cause of action, could impose huge financial burdens on municipal, local, and state government entities by opening them up to lawsuits for damages which lack defined boundaries, and

(iv) the Court believes the Delaware State Legislature is the entity best suited to create a new cause of action in this instance.[82]

---

[80] *See* Del. Const. art. 1, § 6 ("The people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.").

[81] *Schueller v. Cordrey*, 2017 WL 568344, at *1 (Del. Super. Feb. 13, 2017) ("[T]he Court will not extend *Bivens* liability to create a new cause of action for damages under Article I, Section 6 of the Delaware Constitution."); *id.* at *2 ("[T]he facts of this case do not warrant creating a new cause of action for excessive force under Article I, Section 6 of the Delaware Constitution . . . .").

[82] *Id.* at *2 (formatting altered).

Those are reasons that might address parts of a test. They do not establish a test.

The second decision—*Amoako*—followed *Schueller* in holding that no private right of action existed to recover damages under Article I, Section 6.[83] *Amoako* did not go beyond *Schueller*.

The third decision—*Rodriguez*—addressed whether a plaintiff could sue for damages under Article I, Section 7[84] and the Cruel Punishment Clause.[85] *Rodriguez* relied on *Schueller* and held that its reasoning "applies equally to the constitutional violations alleged . . . in this case."[86]

None of the Delaware state court decisions established a test for determining whether a private right of action exists. In a footnote, *Schueller* cited as "highly persuasive" the Pennsylvania Commonwealth Court's decision in *Jones*, which

---

[83] *Amoako v. Clayton Police Dep't*, 2024 WL 3596419, at *4 (Del. Super. July 31, 2024).

[84] Del. Const. art. I, § 7 ("In all criminal prosecutions, the accused has a right to be heard personally and by counsel, to be plainly and fully informed of the nature and cause of the accusation against the accused, to meet the witnesses in their examination face to face, to have compulsory process in due time, on application by the accused, the accused's friends or counsel, for obtaining witnesses in the accused's favor, and a speedy and public trial by an impartial jury; the accused shall not be compelled to give evidence against the accused's own self, nor shall the accused be deprived of life, liberty, or property, unless by the judgment of the accused's peers or by the law of the land.").

[85] *Rodriguez v. Cahall*, 2023 WL 569358 (Del. Super. Jan. 27, 2023).

[86] *Id.* at *6.

rejected a similar implied cause of action under that state's constitution.[87] *Jones* did not identify a test either. That decision elided the question of whether a private right of action exists with the question of whether a clause in the Pennsylvania Constitution had a different meaning than a similar clause in the U.S. Constitution. The Supreme Court of Pennsylvania had instructed courts evaluating the latter issue to consider (1) the text of the Pennsylvania Constitution, (2) the history of the provision, including Pennsylvania case law, (3) related case law from other states, and (4) "policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence."[88] *Jones* worked through those factors.

Although none of the four decisions established a test, it is possible to reverse engineer a test that would generate the answers that the decisions reached. The first reason *Schueller* offered appears responsive to the question, "Does the plaintiff already have an adequate remedy?" *Schueller* reasoned that the plaintiff had an adequate remedy through a common law tort action for battery or gross negligence, mitigating or eliminating the need to recognize a private right of action.

The second reason *Schueller* offered appears to address the question, "Does an existing state statute define the contours of the remedy?" That factor addresses the

[87] *Id.* at *2 n.4 (citing *Jones v. City of Phila.*, 890 A.2d 1188 (Pa. Commw. Ct. 2006)).

[88] *Jones*, 890 A.2d at 1194 (citing *Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991)).

policy question, "Can the courts readily administer the private right of action, or will there be a host of uncertainties to address?" *Schueller* found no existing statute that would provide guidance. Relatedly, *Schueller* noted in its third reason that any private right of action under Article I, Section 6 would "lack defined boundaries." The implied inquiry might thus be framed as asking, "Does the constitutional provision, an existing state statute, or established common law doctrine sufficiently define the contours of a private right of action so as to make it reasonably administrable?"

The third reason *Schueller* offered appears responsive to two questions. One is "Does the language of the constitutional provision support a private right of action?" The other is "Are there policy reasons that would counsel against recognizing a private right of action?" *Schueller* found nothing in the text of Article I, Section 6 that would support a cause of action for the use of excessive force. *Schueller* expressed concern that recognizing a cause of action could impose financial burdens on municipal, local, and state government entities.

The last reason *Schueller* offered appears responsive to the question, "Is the judiciary constitutionally empowered and equipped to recognize a private right of action?" Citing separation of powers concerns, *Schueller* deferred to the General Assembly.

The reverse-engineering produces five questions that could form part of a test:

- Does the language of the constitutional provision support a private right of action?

- Does the constitutional provision, an existing state statute, or established common law doctrine sufficiently define the contours of a private right of action so as to make it reasonably administrable?

46

- Is there a need for a private right of action, or does the plaintiff already have adequate remedies?

- Are there policy reasons that would counsel against recognizing a private right of action?

- Is the judiciary constitutionally empowered and equipped to recognize a private right of action?

As a convenient shorthand, this decision calls this inquiry the "Implicit Delaware Test."

Notably, the cases implicitly asked those questions when considering whether to recognize a private right of action *for money damages.* Those implied questions closely track the types of inquiries that other authorities propose for purposes of that inquiry.

### 2. The Self-Executing Approach

A different approach to private rights of action starts from the premise that constitutional provisions are presumptively self-executing.[89] That approach takes the view that state constitutions are themselves binding law that the judicial branch can enforce on their own terms. As binding law, constitutional provisions do not need legislation to implement them, at least without evidence of a contrary intent. Some states treat all of the provisions in their Bills of Rights as presumptively self-

---

[89] *Enforcing State Constitutions Through Constitutional Torts*, 139 Harv. L. Rev. 1402, 1407 (2026).

executing.[90] Others examine each right individually.[91] Notably, whether a provision is self-executing does not mean it automatically supports a damages remedy. A court must answer that question separately.[92]

In *Shields*, the Supreme Court of Vermont identified four factors to consider when determining whether a constitutional provision is self-executing. First, the

[90] *See, e.g.*, *Phillips v. Youth Dev. Program, Inc.*, 459 N.E.2d 453, 457 n.4 (Mass. 1984) ("[T]here is no need for legislative implementation to afford an appropriate remedy to redress a violation of [explicit state constitutional] rights."); *Cooper v. Nutley Sun Printing Co.*, 175 A.2d 639, 643 (N.J. 1961) (indicating that courts have inherent power to enforce the New Jersey Constitution even in the absence of enabling legislation); *Robb v. Shockoe Slip Found.*, 324 S.E.2d 674, 681 (Va. 1985) ("[C]onstitutional provisions in bills of rights and those merely declaratory of common law are usually considered self-executing.").

[91] *See, e.g.*, *Moresi v. State*, 567 So.2d 1081, 1092–93 (La. 1990) (holding that constitutional right to privacy was self-executing); *Leger v. Stockton Unified Sch. Dist.*, 249 Cal. Rptr. 688, 690–93 (Cal. Ct. App. 1988) (holding that constitutional right to safe schools was not self-executing); *Schreiner v. McKenzie Tank Lines & Risk Mgmt. Servs., Inc.*, 408 So.2d 711, 714 (Fla. 1st Dist. Ct. App. 1982) (holding constitutional prohibition against discrimination for a physical disability was self-executing); *Walinski v. Morrison & Morrison*, 377 N.E. 242, 244–45 (Ill. App. Ct. 1st Dist. 1978) (holding anti-discrimination clause was self-executing); *Agostine v. Sch. Dist. of Phila.*, 527 A.2d 193, 195 (Pa. Commw. Ct. 1987) (holding constitutional provision calling for "a thorough and efficient system of education" was not self-executing); *Shields v. Gerhart,* 658 A.2d 924, 928–30 (Vt. 1995) (holding free speech clause was self-executing but natural-rights clause was not).

[92] *See Shields*, 658 A.2d at 930–31; *see Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.*, 838 P.2d 263, 268 (Alaska 1992) (declining to recognize damages remedy for due process violation when other administrative remedies available); *Bd. of Cty. Comm'rs v. Sundheim*, 926 P.2d 545, 553 (Colo. 1996) (declining to do the same); *Rockhouse Mountain Prop. Owners Ass'n, Inc. v. Town of Conway*, 503 A.2d 1385, 1389 (N.H. 1986) (declining to recognize damages remedy for due process or equal protection violations where administrative remedies were available). *See generally* Sharon N. Humble, *Implied cause of action for damages for violation of provisions of state constitutions*, 75 A.L.R.5th 619 (2000 & Supp.).

provision "should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection."[93] Second, "a self-executing provision does not contain a directive for further action."[94] Third, legislative history should not counsel against self-execution.[95] Finally, self-execution "must harmonize with the scheme of rights established in the constitution as a whole."[96] As a convenient shorthand, this decision calls this inquiry the "Self-Executing Test."

The Self-Executing Test contrasts with the Implicit Delaware Test by placing primary emphasis on whether the constitutional provision supports the requested private right of action, which is only the first inquiry in the Implicit Delaware Test. Under the Self-Executing Test, if the constitutional provision is self-executing, then the constitution controls and must be enforced, regardless of any lack of implementing legislation.[97] "The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right.

---

[93] *Shields*, 658 A.2d at 928.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.* at 927 ("Therefore, the absence of legislative enabling statutes cannot be construed to nullify rights provided by the constitution if those rights are sufficiently specified."); *see Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.").

The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act."[98]

At least initially, the Self-Executing Test does not engage in the type of policy-based balancing that the last four questions in the Implicit Delaware Test contemplate, such as whether existing remedies are adequate, whether other policy reasons counsel against the right of action, or whether the judiciary is empowered to create the right of action. The Self-Executing Test treats the constitution as the state's supreme law and therefore as already answering those questions in favor of an enforceable right.[99] Those considerations can, however, come into play when

---

[98] *Obergefell v. Hodges*, 576 U.S. 644, 677 (2015); *see* Leonard G. Ratner, *Majoritarian Constraints on Judicial Review*, 27 Vill. L. Rev. 929, 930 (1982) ("If all governmental action should be subject to constitutional constraints and the majoritarian branches ought not define the constraints on their own power, that function must be performed by the judiciary, 'the least dangerous branch.'" (citing The Federalist No. 78 (Alexander Hamilton); A. Bickel, *The Least Dangerous Branch* (1962))).

[99] *Shields*, 658 A.2d at 927 ("We note at the outset the preeminence of the Vermont Constitution in our governmental scheme. As the expression of the will of the people, a constitution stands above legislative or judge-made law"); *id.* ("To deprive individuals of a means by which to vindicate their constitutional rights would negate the will of the people in ratifying the Constitution, and neither this Court nor the Legislature has the power to do so."); *see Davis v. Burke*, 179 U.S. 399, 403 (1900) ("[W]here a constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provision.").

determining whether to recognize money damages as an available form of relief.[100]

*Brown*[101] illustrates the self-executing approach at the state level. There, the New York Court of Appeals followed *Shields* in (1) confirming that the provisions of its state constitution were "presumptively self-executing,"[102] (2) cautioning that a violation of a self-executing provision "will not always support a claim for damages,"[103] then (3) recognizing a damages remedy for violations of the state's equal protection clause and its search and seizure clause.[104]

Federal case law supports the concept of self-executing provisions, and an early decision from the Supreme Court of the United States deployed the term.[105] Although the Supreme Court of the United States as constituted during more recent decades has distanced itself from that approach,[106] important decisions that treated

---

[100] *See Shields*, 658 A.2d at 932–36 (considering broader policy issues, including the availability of other remedies, when evaluating whether to recognize a monetary damages remedy).

[101] *Brown v. State of New York*, 674 N.E.2d 1129 (N.Y. 1996).

[102] *Id.* at 1137.

[103] *Id.* at 1138.

[104] *Id.* at 1139.

[105] *Davis*, 179 U.S. at 403 ("A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.").

[106] *See* Susan Bandes, *Reinventing* Bivens*: The Self-Executing Constitution*, 68 S. Cal. L. Rev. 289, 297–99 (1995).

provisions of the U.S. Constitution as self-executing include *Brown v. Board of Education*,[107] *Ex parte Young*,[108] and *Swafford*,[109] among others.[110]

Federal decisions also reinforce the distinction between a private right of action to seek injunctive or declaratory relief and a private right of action that supports a money damages remedy. *Ex parte Young* is perhaps the best-known example of the former. There, the Supreme Court of the United States permitted "an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant."[111] Since then, the justices have explained that the *Ex parte Young* doctrine "allows suits . . .

---

[107] *Brown v. Bd. of Educ. of Topeka, Kan.*, 347 U.S. 483 (1954) (right to sue in federal court for violation of equal protection clause of Fourteenth Amendment).

[108] *Ex parte Young*, 209 U.S. 123 (1908) (right to sue in federal court for violation of due process clause under the Fourteenth Amendment).

[109] *Swafford v. Templeton*, 185 U.S. 487, 494 (1902) (right to sue in federal court for violation of constitutional right to vote for a member of Congress).

[110] The Thirteenth and Fifteenth Amendments overruled an unfortunate example of another self-executing provision—the Fugitive Slave Clause. U.S. Const. art. IV, § 2. An antebellum decision held that provision supported a private right of action for the recovery of the fugitive slave. *See Prigg v. Pennsylvania*, 41 U.S. 539, 625 (1842).

[111] *Ex parte Young*, 209 U.S. at 159. *See* David L. Shapiro, Ex parte Young *and the Uses of History*, 67 N.Y.U. Ann. Surv. Am. L. 69, 74 (2011) (framing *Ex parte Young* as allowing "a federal action [to] lie to enjoin a state officer from going to state court to seek civil or criminal enforcement of a state law when the action is based on the ground that enforcement will violate the constitutional rights of the plaintiff"); Katherine Mims Crocker, Ex parte Young *Redux*, 103 Wash. U. L. Rev. 1549, 1549 (2026) (framing *Ex parte Young* as "permitting federal courts to prevent state officials from enforcing unconstitutional state statutes").

for declaratory or injunctive relief against state officers in their official capacities"[112]

who "are violating, or planning to violate, federal law."[113] Scholars describe *Ex parte Young* as "a 'bedrock' foundation for suits to enjoin enforcement of unconstitutional state (and federal) law."[114]

Over a century later, the Supreme Court of the United States reaffirmed *Ex parte Young*'s fundamental principle. In *Armstrong*, the Court wrote that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal

---

[112] *Reed v. Goertz*, 598 U.S. 230, 234 (2023).

[113] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

[114] William Baude, Jack Goldsmith, John F. Manning, James E. Pfander & Amanda L. Tyler, *Hart And Wechsler's The Federal Courts And The Federal System* 1190 (8th ed. 2025) (citing Barry Friedman, *The Story of* Ex parte Young*: Once Controversial, Now Canon*, *in Federal Courts Stories* 247 (Vicki C. Jackson & Judith Resnik eds., 2010)); *see also id.* at 1191 ("In its wake, Judge Henry Friendly described [*Ex parte Young*] as the 'fountainhead' of civil rights enforcement; Professor Charles Alan Wright called it 'indispensable' . . . ."); Crocker, *supra*, at 1552 (describing *Ex parte Young* as "one of the most important cases facilitating the protection of constitutional rights in American law"); James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex parte Young, 72 Stan. L. Rev. 1269, 1269 (2020) (describing *Ex parte Young* as "a cornerstone of modern constitutional litigation").

executive action, tracing back to England."[115] On the facts of *Armstrong*, however, the Court denied relief.[116]

As with state-level authorities, federal authorities point to more complex considerations when determining if a private right of action for a constitutional violation can support a damages claim. *Bivens*[117] stands as the most famous example. There, the Supreme Court of the United States held that the Fourth Amendment "guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority."[118] The

---

[115] *Armstrong*, 575 U.S. at 327 (citing Louis Leventhal Jaffe & Edith G. Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)); *see id.* ("'[R]elief may be given in a court of equity . . . to prevent an injurious act by a public officer.'" (quoting *Carroll v. Safford*, 44 U.S. 441, 463 (1845)).

[116] *Id.* at 326–32. The plaintiffs in *Armstrong* attempted to sue under the Supremacy Clause. The Court held that no private right of action to enforce the Supremacy Clause existed, and the Medicaid Act precluded, rather than provided for, a private right of action to enforce the section in question. *Id.*

*Armstrong* and other recent decisions have sparked debate about whether the Supreme Court of the United States is retreating from *Ex parte Young*. *See, e.g.*, Note, *Congressional Intent to Preclude Equitable Relief:* Ex parte Young *After* Armstrong, 131 Harv. L. Rev. 827, 829 (2018); Vicki C. Jackson, Seminole Tribe*, the Eleventh Amendment, and the Potential Evisceration of* Ex parte Young, 72 N.Y.U. L. Rev. 495 (1997); David P. Currie, Ex parte Young *After* Seminole Tribe, 72 N.Y.U. L. Rev. 547 (1997). As traditionally understood, however, *Ex parte Young* and its progeny demonstrate that private parties can obtain injunctions preventing government officials from taking unconstitutional actions.

[117] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Fourth Amendment, searches and seizures).

[118] *Id.* at 392.

Court also explained that "where federally protected rights have been invested, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."[119] For purposes of enforcing the Fourth Amendment through a cause of action for damages, the Court saw "no special factors counseling hesitation in the absence of affirmative action by Congress."[120]

Justice Harlan concurred. He explained that the judiciary has a particular responsibility to enforce the federal Bill of Rights, which was "intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities."[121] He maintained that where the U.S. Constitution created the right, the Court had the power to craft a remedy.[122]

Three justices dissented. They argued against recognizing a damages remedy and in favor of "recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power."[123]

After *Bivens*, the Supreme Court of the United States recognized two additional private rights of action to recover damages for breaches of constitutional

---

[119] *Id.* (cleaned up).

[120] *Id.* at 396.

[121] *Id.* at 407 (Harlan, J., concurring).

[122] *Id.* at 400–01 (Harlan, J., concurring).

[123] *Id.* at 412 (Burger, C.J., dissenting); *accord id.* at 427–28 (Black, J., dissenting); *id.* at 430 (Blackmun, J., dissenting).

provisions. In *Davis*,[124] the Court authorized a former congressional staffer to pursue a damages remedy against a member of Congress who had violated the Fifth Amendment's guarantee of due process by discriminating against the staffer on the basis of sex. Significantly for this case, the Court in *Carlson*[125] recognized a private right of action for violations of the Eighth Amendment. The Court looked for "special factors counselling hesitation in the absence of affirmative action by Congress" and found none.[126] The Court found that Congress had not created an equally effective alternative remedy and, when enacting the Federal Tort Claims Act, expected a damages remedy for violations of constitutional provisions to remain available.[127] The Court also cited features that made the constitutional cause of action superior and the remedy under the Federal Tort Claims Act comparatively inadequate.[128]

---

[124] *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment, due process, sex discrimination).

[125] *Carlson v. Green*, 446 U.S. 14 (1980).

[126] *Id.* at 18.

[127] *Id.* at 20–21.

[128] *Id.* at 20–24. Since *Carlson*, changes in the composition of the Court have led to sharply different views on implied rights of action for money damages. *See* Richard H. Fallon, Jr., *Bidding Farewell to Constitutional Torts*, 107 Cal. L. Rev. 933, 951 (2019) ("In the years following *Davis v. Passman* and *Carlson v. Green*, the Supreme Court has rejected *Bivens* claims in every context in which it has ruled on them."); *see, e.g., Butz v. Economou*, 438 U.S. 478 (1978) (no implied right of action where qualified and absolute immunity doctrines precluded damages suit); *Bush v. Lucas*, 462 U.S. 367, 374, 378 n.14 (1983) (no implied right of action for a federal employee alleging First Amendment violations because a statutory remedy, though "less than complete" was "clearly constitutionally adequate"); *Chappell v. Wallace*,

462 U.S. 296 (1983) (no implied right of action for military personnel in a suit against a superior officer); *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (no implied right of action where the Social Security Act failed to provide consequential damages for previous denial of back benefits because "Congress has provided what it considers adequate remedial mechanisms"); *F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) (no implied right of action against agency itself, as *Bivens* designed to deter the individual officer); *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (same); *Wilkie v. Robbins*, 551 U.S. 537 (2007) (no implied right of action where other administrative remedies available); *Hui v. Castaneda*, 559 U.S. 799 (2010) (no implied right of action where the Federal Tort Claims Act provided absolute immunity to federal employee and limited recovery to suits against the United States itself); *Minecci v. Pollard*, 565 U.S. 118 (2012) (no implied right of action where state law remedies adequate even if not perfectly congruent with potential *Bivens* remedy). In 2017, the Supreme Court distilled a two-step test for determining whether an implied right of action exists under *Bivens*. First, the court asks whether the case presents a new *Bivens* context that differs meaningfully from previous *Bivens* cases. If so, the court asks whether there are any special factors that counsel hesitation about extending *Bivens* to this new context. *See Ziglar v. Abbasi*, 582 U.S. 120 (2017) (referring to *Bivens*, *Davis*, and *Carlson* as an "ancien regime"). The cases that followed *Abbasi* limited *Bivens*' application further. *See Hernandez v. Meza*, 589 U.S. 93, 103 (2020) (applying *Abbasi* and holding that a cross-border shooting presented a "glaringly obvious" new context and special factors of national security and foreign affairs counseled against extending *Bivens*); *Egbert v. Boule*, 596 U.S. 482, 483, 492 (2022) (describing the *Abbasi* inquiry as "often resolv[ing] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy" and stating "if there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy"); *see also* Danielle C. Jefferis, *RIP Bivens*, 103 Neb. L. Rev. 1, 2 (2024) ("[S]ince the Supreme Court's most recent decision on the issue in *Egbert v. Boule*, lower federal courts have overwhelmingly heeded the Court's repeated admonitions to avoid extending the cause of action to virtually all contexts that do not precisely mirror the three cases in which the Court recognized the cause of action decades ago: *Bivens* itself, *Davis v. Passman*, and *Carlson v. Green*."). Despite this recent trend, *Bivens*, *Davis*, and *Carlson* demonstrate that courts can treat constitutional provisions as self-executing and craft remedies to make them meaningful. *See* Carlos M. Vásquez, *Bivens and the Ancien Régime*, 96 Notre Dame L. Rev. 1923, 1926 (2021) (citing Justice Powell's decision in *Cannon v. University of Chicago*, 441 U.S. 677, 733 n.3 (1979), as recognizing the Court's "traditional responsibility to safeguard constitutionally protected rights" and "the freer hand [the Court] necessarily ha[s] in the interpretation of the Constitution" as permitting "greater judicial creativity with respect to implied causes of action.").

The self-executing approach thus finds support at both the state and federal levels. For injunctive and declaratory relief, the self-executing approach is well-established. Where money damages are concerned, the inquiry is more complex.

### 3. Common Law Enforcement

Rather than treating constitutional provisions as self-executing, some courts view them as enforceable under the common law.[129] When taking this approach, courts have looked to Section 874A of the *Restatement (Second) of Torts*.[130]

Section 874A addresses tort liability for violating a "legislative provision," but the commentary defines that term as including "constitutional provisions."[131] The blackletter states:

> When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, afford to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.[132]

The commentary explains that "[i]f, in a particular case, the court determines that it is appropriate to provide a civil action in order to effectuate the policy behind a

---

[129] *See* Enforcing State Constitutions, *supra*, at 1407.

[130] *Id.*

[131] Restatement (Second) of Torts § 874A cmt. a (Am. L. Inst. 1979), Westlaw (database updated June 2026).

[132] *Id.* § 874A.

legislative provision, that civil action will normally sound in tort."[133] As a result, the action can support "damages or injunctive relief."[134] One commentator argues that "[s]tate bills of rights provisions are exceptionally amenable to enforcement by a section 874A 'implied' right of action because they tend to be phrased as declarations either of positive rights or of limitations on government, but without simultaneously specifying a 'civil remedy.'"[135]

The *Restatement* advises that "[t]he primary test for determining whether the courts should provide a tort remedy . . . is whether this remedy is consistent with the legislative provision, appropriate for promoting its policy and needed to assure its effectiveness."[136] The *Restatement* suggests considering the following factors:

(1) The nature of the legislative provision. . . .

(2) The adequacy of existing remedies. . . .

(3) The extent to which the tort action will aid or supplement or interfere with, existing remedies and other means of enforcement. . . .

(4) The significance of the purpose that the [provision at issue seeks] to effectuate. . . .

(5) The extent of the change in tort law. . . .

---

[133] *Id.* § 874A cmt. f.

[134] *Id.*

[135] Jennifer Friesen, *Recovering Damages for State Bills of Rights Claims*, 63 Tex. L. Rev. 1269, 1283 (1985).

[136] Restatement (Second) of Torts, *supra*, § 874A cmt. h.

(6) The burden that the new cause of action will place on the judicial machinery. . . .[137]

The *Restatement* recommends basing the cause of action on "the most similar common law tort,"[138] while explaining that "[i]f there is no common law tort sufficiently analogous . . . , a new tort may be created for the purpose."[139]

To assess legislative purpose, the *Restatement* calls for looking for indications of legislative intent in the text or legislative history. It also suggests applying the maxim *ubi ius ibi remedium*, or "where there is a right, there is a remedy."[140] That maxim suggests "that if the legislation created a right it must have been intended to create an adequate remedy to enforce that right."[141] At the same time, the *Restatement* acknowledges that in some situations, the maxim of *expressio unius exclusio alterius est* may cut in the opposite direction.

If there is no discernible legislative intent either way, then the *Restatement* suggests asking "how the legislative body 'would have dealt with the concrete situation' if it had had the situation before it in the way in which it is now before the court."[142] Conducting that inquiry requires "looking for the policy behind the

---

[137] *Id.*

[138] *Id.* cmt. f.

[139] *Id.*

[140] *Id.* cmt. c.

[141] *Id.*

[142] *Id.* cmt. d.

legislative provision, attempting to perceive the purpose for which it was enacted, and then, having ascertained that policy or purpose, determining the most appropriate way to carry it out and identifying the remedy needed to accomplish that result."[143]

Doubtless recognizing that some resist the notion of judicially created causes of action, the *Restatement* takes pains to stress how common it is. "Common law torts were created by the courts, and they are still subject to being modified by the courts. . . . New torts arise with some frequency, and they are usually judicially created."[144]

> Judicial adaptation of common law torts because of the passage of criminal statutes or other legislation is not a rare occurrence, although the extent to which it takes place may not have been generally recognized. It has happened, for example, in such diverse torts as battery, false imprisonment, trespass to real property, privacy, deceit, defamation, seduction, interference with advantageous relations and intentional infliction of emotional distress.[145]

The *Restatement* nevertheless cautions that a court "must be acutely aware of the discretionary decisions that are posed for it and the heavy responsibility that they entail," even though the court "will ordinarily discuss the problem largely in terms of ascertaining the legislative intent or purpose."[146]

Although no Delaware court has used Section 874A to address whether a

---

[143] *Id.*

[144] *Id.* cmt. f.

[145] *Id.*

[146] *Id.* cmt. i.

constitutional provision gives rise to a cause of action, Delaware decisions have relied on Section 874A when determining whether a *statute* supports a cause of action for money damages.[147] For purposes of statutory analysis, "[t]he inquiry is threefold: (1) whether the plaintiff is a member of a class for whose special benefit the statute was enacted; (2) whether there is any indication of legislative intent to create or deny a private right of action; and (3) whether recognition of an implied private right [of] action would advance the statute's purpose."[148] Most Delaware decisions have

---

[147] *Doe v. Bradley*, 2011 WL 290829, at *14–17 (Del. Super. Jan. 21, 2011) (declining to create a private right of action for violations of statutes imposing reporting requirements on medical professionals); *accord Doe 30's Mother v. Bradley*, 58 A.3d 429, 453 (Del. Super. 2012) (reiterating rejection of right of action for violating statutory reporting requirement).

[148] *Thompson v. Lewis*, 324 A.3d 255, 257 (Del. Super. 2024); *accord Schuster v. Derocili*, 775 A.2d 1029, 1036 n.42 (Del. 2001).

declined to recognize private rights of action to enforce statutes,[149] but a few have.[150]

---

[149] *See, e.g.*, *Brett v. Berkowitz*, 706 A.2d 509, 511 (Del. 1998) (holding that "claims against the lawyer for offensive touching and sexual harassment cannot be based on criminal statutes, although they could be the basis for a claim of intentional tort"); *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 896–99 (Del. 1994) (declining to recognize a private right of action to appeal decisions of the Environmental Appeals Board under 7 *Del. C.* §§ 6008(a) & 7210); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del. 1993) (declining to recognize a private right of action for consumers under the Deceptive Trade Practices Act, 6 *Del. C.* § 2532); *Miller v. Spicer*, 602 A.2d 65, 68 (Del. 1991) (declining to recognize private right of action under Equal Accommodation Act, 6 *Del. C.* § 4502); *Yeilding v. Council of Ass'n of Unit Owners of Pelican Cove Condo.*, 2022 WL 1161347, at *10 (Del. Ch. Apr. 20, 2022) (declining to recognize a private right of action under 25 *Del. C.* § 2205); *O'Neill v. Town of Middletown*, 2006 WL 205071, at *20–22, *24 (Del. Ch. Jan. 18, 2006) (declining to recognize private right of action under 29 *Del. C.* §§ 9103, 9203 & 9204 or under 17 *Del C.* §§ 131 & 508); *Couch v. Delmarva Power & Light Co.*, 593 A.2d 554, 559 (Del. Ch. 1991) (declining to recognize private right of action under 3 *Del. C.* § 902); *Lock v. Schreppler*, 426 A.2d 856, 863–67 (Del. Super. 1981) (declining to recognize a private right of action under 24 *Del. C.* § 2912(a)); *Callaway v. N. B. Downing Co.*, 172 A.2d 260, 262–63 (Del. Super. 1961) (declining to recognize a private right of action under 29 *Del. C.* § 6916).

[150] *See, e.g.*, *Young v. Joyce*, 351 A.2d 857, 858–59 (Del. 1975) (recognizing private cause of action for violation of Consumer Fraud Act, 6 *Del. C.* § 2511, and 6 *Del. C.* § 2513); *Thompson*, 324 A.3d at 259 (recognizing private cause of action under Motor Vehicle Financial Responsibility Act, 21 *Del. C.* § 2907); *Heller v. Dover Warehouse Mkt., Inc.*, 515 A.2d 178, 181 (Del. Super. 1986) (recognizing private right of action for employees under anti-polygraph statute, 19 *Del. C.* § 704); *Smith v. Delaware Coach Co.*, 70 A.2d 257, 261–62 (Del. Ch. 1949) (permitting private litigant to seek injunctive relief to enforce 47 *Del. C.* § 254; "The powers of the Public Service Commission are wholly statutory, and if it does not comply with the prescribed jurisdictional provisions, action pursuant to any order made may be enjoined by a court of equity under its long established general jurisdiction unless some other exclusive remedy at law is given by the statute."); *cf. Schuster*, 775 A.2d at 1036 (recognizing a claim for breach of the implied covenant of good faith and fair dealing based on sexual harassment in the workplace; finding cause of action not precluded by 19 *Del. C.* §§ 711 & 712); *Brown v. City of Wilm.*, 2019 WL 141744, at *6 (Del. Super. Jan. 8, 2019) (recognizing right to enforce mandatory health insurance policy through combination of collective bargaining agreement and Appropriations Act).

### 4. Right-To-A-Remedy Clauses

A final pathway for recognizing state constitutional torts turns on a provision that the U.S. Constitution lacks: a right-to-a-remedy clause. Provisions of that sort appear in forty state constitutions and generally provide that "every [person] for . . . injury done [to person, property, or reputation] . . . shall have remedy in court."[151]

Some courts have interpreted right-to-a-remedy clauses as requiring a remedy whenever a right has been violated.[152] Others have held that the provisions only restrict legislatures from altering or amending well-established common law rights.[153] Still others have held that the provisions merely declare a broad principle of justice that provides guidance to the legislature.[154] Under a strong reading, a right-to-remedy clause must, at a minimum, protect absolute rights enshrined in state constitutions, unless a state has provided adequate protection through a statutory scheme.[155]

Under the right-to-a-remedy approach, a court must initially determine whether the constitutional right is mandatory. If so, then the court must assess whether (1) no remedial scheme exists, (2) a common law remedy but no statutory

---

[151] Enforcing State Constitutions, *supra*, at 1408 (footnote omitted).

[152] *Id.*

[153] *Id.* at 1409.

[154] *Id.*

[155] *Id.*

remedial scheme exists, (3) a statutory remedial scheme exists that is not expressly exclusive or does not otherwise preempt constitutional rights of action, or (4) a statutory scheme exists that is exclusive or that preempts constitutional rights of action. The court should also consider the potential availability of immunities.[156]

When a right exists but the legislature has not established a remedial scheme, courts have the most freedom to act because there is the least risk of implicating separation of powers concerns. In that setting, the right calls for a remedy.

Where there is a common law remedy but no statutory scheme, the case for a constitutional right of action is weaker, but only marginally so. While some courts have treated existing common law remedies as sufficient, other courts have recognized that constitutional rights warrant greater protection and serve different interests than state tort law. In this setting, separation of powers concerns are not extant because common law remedies are judicially created already. Therefore, "[w]hen a common law remedy exists, but no statutory one, courts should still craft constitutional remedies when necessary to ensure adequate rights enforcement."[157]

If an existing legislative remedy exists, then courts should ask two questions. First, is the remedy exclusive? Second, is the remedy adequate?

If the remedy is not exclusive and inadequate, then the court remains free to fashion a constitutional remedy. Even if the remedy is exclusive, the court has a

---

[156] *Id.* at 1418–21.

[157] *Id.* at 1414.

responsibility to assess whether the remedy is inadequate to ensure that the constitutional right is protected, although courts should defer to the legislature's judgment when doing so.[158]

## B.     Framing A Suggested Test

Without guidance from the Delaware Supreme Court, this decision combines the various approaches to create a test. As a convenient shorthand, this decision calls it the "Suggested Test."

The Suggested Test starts with the first question in the Implicit Delaware Test: Does the language of the constitutional provision support the requested private right of action? That is equivalent to asking whether the provision is self-executing.

Because of that equivalence, answering that question warrants considering versions of the four factors that the Self-Executing Test uses:

- Does the provision describe an affirmative or negative right that goes beyond expressing general principles?

- Is the provision free from indications that legislative implementation is contemplated?

- Does the provision's history support treating it as self-executing?

- Does treating the provision as self-executing fit harmoniously with the scheme of rights established in the Delaware Constitution as a whole?

If the answer to each question is "yes," then the constitutional provision is self-executing and supports a private right of action.

At that point, the Suggested Test adopts a core premise of the Self-Executing

---

[158] *Id.* at 1414–18.

Test, namely that a distinction exists between recognizing a private right of action that a court can enforce through equitable relief and authorizing a private right of action to seek money damages. Recognizing a private right of action is presumptively sufficient for equitable relief.[159]

The Suggested Test overlaps with the analysis that Delaware courts use when determining whether to imply a private right of action under a statute. The Suggested Test sweeps in the implied-statutory-remedy test's second question, *i.e.*, whether there is any indication of legislative intent to create or deny a private right of action. The Suggested Test does not expressly incorporate the first question, *i.e.*, whether the plaintiff is a member of a specific class that the provision seeks to protect. Because many constitutional rights seek to establish fundamental protections for residents or, at a minimum, citizens, the special class inquiry fits poorly. But if the provision does suggest special protection for a specific class that includes the plaintiff, that is a consideration that favors self-execution. At this stage of the analysis, the Suggested Test does not consider the third question, *i.e.*, whether recognition of an implied private right of action would advance the statute's purpose. If a provision is

---

[159] *See Birney v. Del. Dep't of Safety & Homeland Sec.*, 2022 WL 16955159, at *2 (Del. Ch. Nov. 16, 2022) ("Nonetheless, if the Plaintiffs require equity to enforce a finding of unconstitutionality—that is, if it appears that the State would otherwise attempt to enforce an unconstitutional statute—they have stated a quintessential basis for equitable jurisdiction."); *see also id.* ("That is not to say that equity has no place in the enforcement of constitutional rights. It plainly, even famously, does." (citing *Belton v. Gebhart*, 87 A.2d 862 (Del. Ch.), *aff'd*, 91 A.2d 137 (Del. 1952), *aff'd sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955).

self-executing, then the implied private right of action advances its purpose.

The Suggested Test folds the concept of common law enforcement into the inquiry into whether the provision's history supports treating it as self-executing. If the provision reflects a right that the Anglo-American courts traditionally enforced, then that is part of the provision's history and supports treating it as self-executing.

The Delaware Constitution has a right-to-a-remedy clause. The Suggested Test accounts for its implications when evaluating whether treating a provision as self-executing fits harmoniously with Delaware's constitutional scheme.

If the analysis has proceeded this far, then the Suggested Test adopts the framework proposed by the right-to-a-remedy approach, which calls on the court to assess whether (1) no remedial scheme exists, (2) a common law remedy but no statutory remedial scheme exists, (3) a statutory remedial scheme exists that is not expressly exclusive or does not otherwise preempt constitutional torts, or (4) a statutory remedial scheme exists that is exclusive. If a remedial scheme exists, then the court must assess whether it is constitutionally adequate.

Determining whether the remedial scheme is constitutionally adequate asks the same question as the third step of the Implicit Delaware Test, but from the opposite direction. The Implicit Delaware Test asks, "Is there a need for the private right of action or does the plaintiff already have adequate remedies?" At this point in the inquiry under the Suggested Test, the constitutional right exists and is self-executing. The burden, therefore, should rest on the proponents of the alternative remedy to show that it is adequate. The burden should not rest on the party seeking

to enforce the constitutional provision to show that a private right of action is needed.

The resulting inquiry resembles how a court evaluates whether a legislative remedy displaces the Court of Chancery's equitable jurisdiction over an area of law.[160] That makes sense, because the question is whether the remedial scheme displaces the Court of Chancery's ability to use equitable relief to enforce a constitutional right. That allocation of the burden also reflects that:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. Fundamental rights may not be submitted to a vote; they depend on the outcome of no elections.[161]

---

[160] *See DuPont v. DuPont*, 85 A.2d 724, 729–30 (Del. 1951) ("We conclude, therefore, that Section 17 [of the Constitution of 1897] is not an authorization to the Legislature to restrict Chancery jurisdiction to less than it was in 1792. We think the Constitutions of 1792, 1831 and 1897 intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity."; holding that the General Assembly cannot deprive the Court of Chancery of jurisdiction without authorizing a fully sufficient alternative remedy that is "the equivalent of the remedy available in the Court of Chancery"); *see also Glanding v. Indus. Tr. Co.*, 45 A.2d 553, 558–59 (Del. 1945) ("It cannot be said too forcefully that the general powers of the Court of Chancery refers to that complete system of equity as administered by the High Court of Chancery of Great Britain, and a proper interpretation of the constitutions of this State lead to but one conclusion; that is, that the Court of Chancery shall continue to exercise that complete system of equity jurisdiction in all respects until the Legislature of this State shall provide otherwise, as by granting the exercise of a part of that jurisdiction exclusively to some other tribunal.").

[161] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943); *accord Obergefell*, 576 U.S. at 677 ("The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public

If constitutional rights depended on legislative implementation for enforcement, then they would not be fundamental rights. They would exist as a matter of legislative grace.

If a remedial scheme exists and is constitutionally adequate, then the implied right of action has been displaced. If no remedial scheme exists or if the scheme is not constitutionally adequate, then the analysis ends—at least for purposes of a private right of action that does not contemplate monetary relief. A private right of action exists and is judicially enforceable.

In reaching this conclusion, the Suggested Test proceeds from the premise that the Delaware Constitution is the state's supreme law. If the analysis has reached this stage, then the provision demands potential equitable enforcement. The framers of the Delaware Constitution have answered the policy question in favor of the constitutional right. There also are no separation of powers issues or questions regarding the judiciary's competence to enforce the provision. The Delaware Constitution has again answered those questions by including the self-executing

_____

disagrees and even if the legislature refuses to act."); Ratner, *supra*, at 929 (observing "the context of a constitution, and promptly adopted amendments, designed to protect minorities, including individuals, from oppressive majority action"); *see also id.* at 930 ("If all governmental action should be subject to constitutional constraints and the majoritarian branches ought not define the constraints on their own power, that function must be performed by the judiciary, 'the least dangerous branch.'" (citing The Federalist No. 78 (Alexander Hamilton); Bickel, *supra*, *The Least Dangerous Branch*)); Girardeau A. Spann, *Race Against the Court: The Supreme Court & Minorities in Contemporary America* 2 (1993) ("[T]he Supreme Court is expected to insulate minority rights from the majoritarian efforts at exploitation to which those rights would otherwise be vulnerable."))).

70

provision in the constitution.

The Suggested Test, therefore, does not ask the last three questions in the Implicit Delaware Test, namely:

- Are there policy reasons that would counsel against recognizing the private right of action?

- Is the judiciary constitutionally empowered and equipped to recognize the requested private right of action?

- Does the constitutional provision, an existing state statute, or established common law doctrine sufficiently define the contours of the requested private right of action so as to make it reasonably administrable?

By contrast, if the question is whether to grant an implied right of action that supports monetary relief, then considering those additional issues is warranted.

## C. Applying The Suggested Test

Applying the Suggested Test to the Cruel Punishment Clause supports recognizing a cause of action for injunctive relief. This decision does not address whether a violation of the Cruel Punishment Clause could support a money damages remedy.

### 1. Does The Cruel Punishment Clause Describe A Right That Goes Beyond General Principles?

The first factor is whether the Cruel Punishment Clause describes an affirmative or negative right that goes beyond expressing general principles, such as hortatory statements, aspirational ideals, or broad concepts. To reiterate, the Cruel Punishment Clause appears in Article I, Section 11 of the Delaware Constitution, which states in its entirety: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and in the construction of jails a proper

71

regard shall be had to the health of prisoners."[162]

The Cruel Punishment Clause is the third of three mandatory clauses, each framed in the negative. First, excessive bail must not be required. Second, excessive fines must not be imposed. Third, cruel punishments must not be inflicted. Those clauses precede one mandatory clause framed affirmatively: When constructing jails, give proper regard to prisoners' health.

Those provisions are not hortatory statements, aspirational ideals, or broad concepts about how government should hopefully work.[163] Nor do they provide general guidance for the General Assembly to follow when legislating.

The Delaware Supreme Court has treated both the Excessive Bail Clause[164]

---

[162] Del. Const. art. I, § 11.

[163] *Compare id.* pmbl. ("Through Divine goodness, all people have by nature the rights of worshiping and serving their Creator according to the dictates of their consciences, of enjoying and defending life and liberty, of acquiring and protecting reputation and property, and in general of obtaining objects suitable to their condition, without injury by one to another; and as these rights are essential to their welfare, for due exercise thereof, power is inherent in them; and therefore all just authority in the institutions of political society is derived from the people, and established with their consent, to advance their happiness; and they may for this end, as circumstances require, from time to time, alter their Constitution of government."). The hortatory language in the preamble "does not have independent legal effect." Randy J. Holland, *The Delaware State Constitution* 30 (2011).

[164] *See State v. Mitchell*, 212 A.2d 873, 884–86 (Del. Super. 1965) (considering challenge by sureties to forfeit of bail bond on the argument that bail was excessive once accused was imprisoned in Pennsylvania; surveying history of bail and rejecting challenge on the merits).

and the Cruel Punishment Clause[165] as self-executing in the sense of having directly enforceable content (admittedly without using the term "self-executing"). Delaware courts have not yet had the opportunity to consider the other two clauses in the provision.

At this point, an advocate against treating the Cruel Punishment Clause as self-executing might cite *Schueller*. When declining to recognize a private right of action to assert a damages claim for the use of excessive force, that order noted that Article I, Section 6 of the Delaware Constitution "does not mention excessive force."[166] Textually true: The provision prohibits "unreasonable searches and seizures."[167] A court therefore would have to read the use of excessive force into the concept of

---

[165] *See Sanders v. State*, 585 A.2d 117, 134 (Del. 1990) (upholding challenge under Cruel Punishment Clause to verdict of guilty but mentally ill based on jury instructions that did not enable jury to properly weigh proportionality of sentence); *State v. Ayers*, 260 A.2d 162, 169 (Del. 1969) (rejecting challenge under Cruel Punishment Clause where sentence fell within General Assembly's discretion to impose "traditional punishments"); *State v. Cannon*, 190 A.2d 514, 518 (Del. 1963) (rejecting challenge to whipping under Cruel Punishment Clause where there had been "no legal and effective expression of the people speaking through the General Assembly that whipping is a cruel punishment in the constitutional sense"); *In re Robertson*, 54 A.2d 848, 850 (Del. Ct. Gen. Sess. 1947) (rejecting on the merits challenge under Cruel Punishment Clause to change in juvenile's location of confinement); *State v. Deputy*, 644 A.2d 411, 422 (Del. Super.) (rejecting challenge to lethal injection under Cruel Punishment Clause on the merits), *aff'd,* 648 A.2d 423 (Del. 1994).

[166] *Schueller*, 2017 WL 568344, at *1.

[167] Del. Const. art. 1, § 6.

"unreasonable," as many courts have done.[168] One could similarly object that the

---

[168] The foundational authority is *Graham v. Connor*, where the Supreme Court of the United States held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard," observing that the Fourth Amendment provides an "explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct." 490 U.S. 386, 394–95 (1989). *See* Kristina C. Castillo, *Supreme Court Jurisprudence on Governmental Use of Excessive Force as Violation of Constitutional or Civil Rights*, 80 A.L.R. Fed. 3d Art. 3 (2023 & Supp.) (collecting United States Supreme Court cases analyzing excessive force under the Fourth Amendment's "reasonableness" standard); Richard P. Shafer, *When does police officer's use of force during arrest become so excessive as to constitute violation of constitutional rights, imposing liability under Federal Civil Rights Act of 1871 (42 U.S.C.A. § 1983)*, 60 A.L.R. Fed. 204 (1982 & Supp.) (collecting federal cases addressing the Fourth Amendment's prohibition of excessive force).

Courts have found that similar state constitutional provisions prohibit excessive force. *See, e.g.*, *Woodall v. Godfrey*, 553 P.3d 249, 256 (Colo. App. 2024) (holding that a "claim that an officer used excessive force . . . implicates the reasonableness requirement" of Colorado constitutional provision prohibiting "unreasonable searches and seizures"); *Stepp v. Cottrell*, 874 S.E.2d 700, 707 (W. Va. 2022) ("Claims of excessive force . . . are governed by the standards of the search and seizure clause contained in West Virginia's Constitution" prohibiting "unreasonable searches and seizures"); *id.* (describing the state's search and seizure clause as "the specific textual source of such protection"); *Bosh v. Cherokee Cty. Bldg. Auth.*, 305 P.3d 994, 1004 (Okla. 2013) (allowing detainee to sue for excessive force under provision of Oklahoma Constitution prohibiting "unreasonable searches or seizures"); *Cyr v. City of Bangor*, 2014 WL 794574, at *6 (D. Me. Feb. 27, 2014) (holding that excessive force claim under provision of Maine Constitution prohibiting "unreasonable searches and seizures" is evaluated under same standard as Fourth Amendment's "objective reasonableness" standard); *Jones*, 890 A.2d at 1206 (finding that the "protections" from "governmental use of excessive force" under the Fourth Amendment and the Pennsylvania constitutional provision similarly prohibiting "unreasonable searches and seizures" are "coextensive"); *see also Hines v. French*, 852 A.2d 1047, 1069 (Md. Ct. Spec. App. 2004) (holding that the "standards for analyzing claims of excessive force are the same under [the provisions] of the Maryland Constitution as that under the Fourth Amendment," although constitutional provisions did not use the words "reasonable" or "unreasonable").

Cruel Punishment Clause does not expressly address OC decontamination, or OC, or the use of force in prisons, or prison conditions generally.

Those are debates about the content of the clauses, so they straddle the line between the threshold question of whether a clause is self-executing and how to apply it. Courts can and have given content to terms like "reasonable" or "unreasonable" in many contexts.[169] Courts likewise can and have given content to a term like "cruel."

---

Of course, interpreting a prohibition on unreasonable searches and seizures to encompass the use of excessive force is different than recognizing a cause of action *for money damages* based on the violation. *Schueller* made its comment when addressing the latter, not the former.

[169] *See* "Reasonableness," A.L.R. Index to Annotations, Westlaw (index updated May 2026) (indexing more than ninety American Law Report annotations addressing courts' interpretations of reasonableness in various areas of American law, such as the reasonableness of attorneys' fees, 56 A.L.R.5th 107, Chapter 13 bankruptcy plans, 63 A.L.R. Fed. 309, the use of an easement of way, 3 A.L.R.3d 1256, an individual's expectation of privacy, 62 A.L.R.5th 1, an individual's use of self-defense, 73 A.L.R.4th 993, or an employee's refusal of medical services provided by their employer in workers' compensation cases, 72 A.L.R.4th 905); Frédéric G. Sourgens, *Reason and Reasonableness: The Necessary Diversity of the Common Law*, 67 Me. L. Rev. 73, 74–75 (2014) (arguing that "[r]easonableness is the keystone of the common law" and citing as examples that "reasonableness governs liability in negligence cases, determines what performance a contract requires, sets the scope of permissible police intrusion in people's private affairs, defines the limit of criminal liability, [ ] administers the diversity of the student body at state universities, . . . [and] informs corporate law, banking law, commercial law, bankruptcy law, and civil procedure" (footnotes omitted) (collecting authorities)); Brandon L. Garrett, *Constitutional Reasonableness*, 102 Minn. L. Rev. 61, 69–70 (2017) ("Reasonableness standards are pervasive in administrative law, civil procedure, contract law, corporate law, criminal law, criminal procedure, employment discrimination law, tort law, and innumerable other fields." (footnotes omitted) (collecting authorities)); Robert Unikel, Comment, *"Reasonable" Doubts: A Critique of the Reasonable Woman Standard in American Jurisprudence*, 87 Nw. U. L. Rev. 326 (1992) ("From its modest beginnings, 'reasonableness' has gained a prominent position in almost every area of American law. A general survey reveals that the concept of 'reasonableness' is a standard of

In *Robertson,* for example, a juvenile prisoner challenged a change in the location of confinement from one facility to another under the Cruel Punishment Clause.[170] The Delaware Supreme Court held that a court must consider "the actual conditions and manner of incarceration" when assessing whether there is a violation of the Cruel Punishment Clause.[171] Courts interpreting the Eighth Amendment have likewise held that it covers conditions of confinement and treatment of prisoners.[172] Those

---

decisionmaking in administrative law, bailment law, constitutional law, contract law, criminal law, tort law, and the law of trusts." (footnotes omitted) (collecting authorities)).

[170] *In re Robertson*, 54 A.2d at 848.

[171] *Id.* at 850.

[172] *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (holding that the Eighth Amendment applies "when the conditions of confinement compose the punishment at issue" and that "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment"); *Hutto v. Finney*, 437 U.S. 678, 685 (1978) (holding that "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that Eighth Amendment includes treatment of prisoners and prohibits "deliberate indifference to serious medical needs of prisoners").

In subsequent decisions, the Supreme Court of the United States has developed the law governing how courts apply the Eighth Amendment test. *E.g.*, *Farmer v. Brennan*, 511 U.S. 825, 829 (1994) (interpreting concept of "deliberate indifference"). The Court has not held that the Eighth Amendment has no application to prison conditions. To the contrary: "The Constitution does not mandate comfortable prisons, but neither does it permit inhuman ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Id.* at 832 (cleaned up). Justice Holland recognized this principle. *See Deputy v. Dr. Conlan*, 947 A.2d 1121 (Del. 2007) (TABLE) ("Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment."); *id.*

rulings demonstrate that the Cruel Punishment Clause carries content that a court can enforce.

The Cruel Punishment Clause describes a specific, mandatory right. The plain language of the Cruel Punishment Clause supports treating it as self-executing.

### 2. Is The Cruel Punishment Clause Free Of Indications That Legislative Implementation Is Contemplated?

The second question is whether the Cruel Punishment Clause is free from indications that legislative implementation is contemplated. It is. There is no reference to the provision being enforced through legislation or otherwise requiring implementation.

Other sections of the Delaware Bill of Rights, by contrast, contemplate legislative implementation. For example:

- <u>Article I, Section 9</u>: "All courts shall be open; and every individual for an injury done to the individual's reputation, person, or movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense. Suits may be brought against the State, *according to such regulations as shall be made by law*."[173]

---

("Deliberate indifference can occur when prison officials deny, delay or intentionally interfere with medical treatment or it may be shown in the way in which prison officials provide medical care.").

[173] Del. Const. art. I, § 9 (emphasis added). The sentence that includes the italicized language is "the basis for the doctrine of sovereign immunity in Delaware." Holland, *supra*, at 68. As a result of that provision, "sovereign immunity is an absolute bar to liability claims against the State of Delaware unless it is waived by the General Assembly." *Id.* The General Assembly has implemented this provision by adopting the Delaware Tort Claims Act. *Id.* The waiver of sovereign immunity requires express statutory language. "For example, a party that enters into a contract

77

- <u>Article I, Section 10</u>: "No power of suspending laws shall be exercised *but by authority of the General Assembly*."[174]

- <u>Article I, Section 17</u>: "No standing army shall be kept *without the consent of the General Assembly*, and the military shall in all cases and at all times be in strict subordination to the civil power."[175]

- <u>Article I, Section 18</u>: "No soldier shall in time of peace be quartered in any house without the consent of the owner; nor in time of war but by a civil magistrate, *in a manner to be prescribed by law*."[176]

No comparable language appears in the Cruel Punishment Clause.

### 3. Does The History Of The Cruel Punishment Clause Support Treating It As Self-Executing?

The third question is whether the history of the Cruel Punishment Clause supports treating the provision as self-executing. It does. Delaware courts have enforced the Cruel Punishment Clause without requiring implementing legislation. Equally important, the broader American tradition of using injunctive relief to protect constitutional rights supports the availability of an action for injunctive relief based on prison conditions.

Delaware courts have consistently applied the Cruel Punishment Clause

---

with a state agency authorized to enter into contracts has all remedies available, including a suit for breach of contract. Article I, Section 8 of the Delaware Constitution also operates as a waiver of sovereign immunity in condemnation proceedings." *Id.*

[174] Del. Const. art. I, § 10 (emphasis added).

[175] *Id.* § 17 (emphasis added).

[176] *Id.* § 18 (emphasis added).

without any requirement for implementing legislation.[177] Before this case, however, no litigant had asked the Court of Chancery to use its equitable powers to enforce the Cruel Punishment Clause.

Based on venerable doctrine, the Court of Chancery lacks jurisdiction to interfere with a criminal prosecution or criminal sentencing.[178] Here, however, the plaintiffs are not asking the court to do either. They ask the court to use its equitable power to require that a government agency comply with a constitutional mandate. That form of equitable relief reflects a long American tradition.

During the nineteenth century, American courts began to deploy their

---

[177] *E.g.*, *Wright v. State*, 633 A.2d 329, 336–39 (Del. 1993) (evaluating whether failure to instruct jury that it could consider age and family background as mitigating circumstances was unconstitutional under either Eighth Amendment or Cruel Punishment Clause); *Sanders*, 585 A.2d at 134 (relying on Cruel Punishment Clause when requiring penalty-phase jury instructions sufficient to permit a jury to assess proportionality when considering the death penalty following a verdict of guilty but mentally ill); *State v. Dickerson*, 298 A.2d 761, 767–68 (Del. 1972) (testing mandatory death penalty for murder under both Eighth Amendment and Cruel Punishment Clause).

[178] *See generally* Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 709 (2022) ("In order to channel and to define the scope of its extraordinary authority, the Court of Chancery and the broader equity tradition developed a series of doctrines to limit equitable powers— principles about what equity will not do. Equity will not enjoin a crime [and] will not enjoin a criminal proceeding . . . ." (footnotes omitted)); Robert A. Leflar, *Equitable Prevention of Public Wrongs*, 14 Tex. L. Rev. 427, 427 (1936) ("It is traditional for courts of equity to state that they have nothing to do with the enforcement of criminal law."); L.S. Tellier, *Injunction as available remedy against prosecution or arrest for conducting business or practicing profession without a license*, 167 A.L.R. 915 (1947 & Supp.).

equitable powers to address public law controversy.[179] John Norton Pomeroy led the

way in encouraging courts to use injunctive relief to address public law issues,[180]

arguing that only equity had the power to do "complete justice."[181] Delaware courts

continue to rely on Pomeroy's treatise.[182]

By 1908, injunctive relief had become the dominant form by which federal

---

[179] Both English and American courts previously achieved similar results through the broad and flexible use of common law writs, such as mandamus, certiorari, and prohibition. *See* Pfander & Wentzel, *supra*, at 1296–1307, 1309–18. At the federal level, in the mid-nineteenth century, Chief Justice Taney led the Supreme Court of the United States in constraining the use of common law writs. *See id.* at 1307–08. At the state level, after the merger of law and equity, courts deployed the more flexible equitable remedies in lieu of the more procedurally rigid common law writs. *See id.* at 1320–23. After the Civil War, federal courts followed state courts in deploying injunctive relief to enforce constitutional and statutory rights. *See id.* at 1328–32. The trend accelerated after Congress conferred federal question jurisdiction in 1875, at which point courts proceeded on the theory that once they had jurisdiction, they could exercise the powers available to a court of equity. *Id.* at 1347.

[180] *See id.* at 1323–24.

[181] 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 175 (5th ed. 1941); *see generally id.* §§ 259–260, 269, 333.

[182] *See, e.g.*, *Reid v. Spazio*, 970 A.2d 176, 182 n.24 (Del. 2009); *Schoon*, 953 A.2d at 204–5; *Kallop v. McAllister*, 678 A.2d 526, 531 (Del. 1996); *Adams v. Jankouskas*, 452 A.2d 148, 152 n.4 (Del. 1982); *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 579–80 (Del. 1964); *Chavin v. H. H. Rosin & Co.*, 246 A.2d 921, 922 (Del. 1968); *DBMP LLC v. Del. Claims Processing Facility, LLC*, 349 A.3d 663, 678 n.38 (Del. Ch. 2025); *FirstString Rsch., Inc. v. JSS Med. Rsch. Inc.*, 2021 WL 2182829, at *8 n.53 (Del. Ch. May 28, 2021); *United BioSource LLC v. Bracket Hldg. Corp.*, 2017 WL 2256618, at *7 n.51 (Del. Ch. May 23, 2017); *Kraft*, 145 A.3d at 979 n.38; *Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 3724745, at *4 (Del. Ch. Sept. 24, 2010); *Taylor v. Jones*, 2006 WL 4804648, at *3 n.10 (Del. Ch. May 25, 2006).

courts enforced constitutional rights.[183] In *Ex parte Young*, stockholders in a railroad sued derivatively in federal court to enjoin Edward Young, the Minnesota Attorney General, from enforcing allegedly "confiscatory" railway rates, contending they violated the corporation's right to due process under the Fourteenth Amendment.[184] After the district court issued the injunction and enforced it through a contempt sanction, Young sought habeas review contending that the lawsuit equated to an action against the State of Minnesota in contravention of the Eleventh Amendment.[185] The Supreme Court of the United States held that the suit could proceed because a court had the power to enjoin defendants who, "as officers of the state, . . . clothed with some duty in regard to the enforcement of the laws of the state, . . . threaten . . . to enforce against parties affected an unconstitutional act [and] violat[e] the Federal Constitution."[186] The majority opinion described the railroad's ability to raise the constitutional violation as a defense in the state enforcement

---

[183] Pfander & Wentzel, *supra*, at 1332.

[184] *Ex parte Young*, 209 U.S. at 148. Everyone involved viewed the state court mandamus proceeding that Young intended to bring and later pursued in violation of the injunction as the equivalent of a criminal enforcement action where a court of equity historically would have lacked jurisdiction to interfere. Pfander & Wentzel, *supra*, at 1274. *See, e.g., In re Sawyer*, 124 U.S. 200, 211 (1888) (observing that the High Court of Chancery "has no jurisdiction to grant an injunction to stay proceedings on a mandamus; nor to an indictment; nor to an information; nor to a writ of prohibition" (quoting *Montague v. Dudman* (1751) 28 Eng. Rep. 253, 254; 2 Ves. Sen. 396, 398)).

[185] *Ex parte Young*, 209 U.S. at 134.

[186] *Id.* at 155–56.

proceeding as "plainly inadequate."[187]

For purposes of the rule of law, *Ex parte Young* reflected progress along two

axes:

> One involves a movement from the common law of torts to constitutional norms to define the standards to which the rule of law most urgently requires official adherence. The second is from damages to equitable remedies as the more indispensable safeguard of constitutional rights. Since the emergence of the modern regulatory state, the greatest threat to constitutional rights comes from statutes and regulations that are enforceable through criminal and civil penalties, not isolated acts of traditionally tortious lawlessness by individual officials.[188]

The decision thus marked an important step for holding public officials accountable

under the rule of law.[189]

The principles set out in *Ex parte Young* flowered in cases like *Brown v. Board*

*of Education*,[190] which enforced the Fourteenth Amendment directly, without relying

on Section 1983 as a statutory vehicle.[191] More recently, the Supreme Court of the

United States has confirmed the availability of direct applications for injunctive relief

against allegedly unconstitutional acts, unless Congress provides an adequate

---

[187] *Id.* at 165.

[188] Fallon, *supra*, at 972.

[189] *Id.* at 944 ("The rule of law requires that governments and their officials be accountable to law.").

[190] 347 U.S. 483.

[191] It was not until 1978 that the Supreme Court of the United States held that local government units were "persons" for purposes of suit under Section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

alternative remedy.[192]

In Delaware, that same tradition is particularly strong. In a series of landmark decisions, Chancellor Seitz issued injunctive relief mandating that first the University of Delaware and later Delaware's public schools comply with the Fourteenth Amendment, without requiring a statutory vehicle.[193]

Enforcing the Cruel Punishment Clause through injunctive relief for purposes of the type of claim the prisoners seek to litigate in this case, therefore, comports with history. Delaware courts have treated the Cruel Punishment Clause as having self-executing content, and Delaware courts have enforced constitutional rights through injunctive relief.[194]

---

[192] *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185–96 (2023) (explaining analytical framework and holding that statutory scheme did not foreclose constitutional challenge seeking injunctive relief); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489–90 (2010) (rejecting contention that statutory limitations on jurisdiction to hear challenges to agency action prevented federal courts from entertaining claim for injunctive and declaratory relief contending that for-cause limitation on removal of agency board members was unconstitutional).

[193] *Belton*, 87 A.2d at 863 ("The question for decision in both cases here presented is whether the State of Delaware, through its agencies, has violated the plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."); *Parker v. Univ. of Del.*, 75 A.2d 225, 227 (Del. Ch. 1950) ("The basic question to be decided involves the application of one of the great guarantees of the Constitution of the United States—the equal protection of the laws.").

[194] That does not mean that this particular judge is the right person to consider claims for injunctive relief under the Cruel Punishment Clause. The Court of Chancery does not handle criminal matters, and I am profoundly aware of my lack of experience in this area. Although it is true that courts often deal with new areas of law, expertise is a valuable commodity. If I am correct that actions of this type can

### 4. Does Treating The Cruel Punishment Clause As Self-Executing Fit Harmoniously With The Delaware Constitution?

The next question asks whether treating the Cruel Punishment Clause as self-executing fits harmoniously with Delaware's constitutional scheme. It does.

As a threshold matter, treating the Cruel Punishment Clause as self-executing comports with how the Delaware Supreme Court has described the courts' role in Delaware's constitutional scheme: "We conceive it the duty of the courts to protect constitutional guarantees . . . . We believe that as long as the Constitution of this state contains the guarantees to the citizen referred to, we have no choice but to use every means at our disposal to preserve those guarantees."[195] The Delaware Supreme Court has described its own role in similar terms, explaining in a case challenging the constitutionality of two statutes that "[t]he Court's role—indeed, our duty—is to hold the challenged statutory enactments up to the light of our Constitution and

---

proceed—and only the Delaware Supreme Court can address that definitively—then they would be good candidates for designating judges in the Delaware Superior Court as Vice Chancellors for purposes of hearing the applications. *See* Del. Const. art. IV, § 13(2) ("The Chief Justice of the Supreme Court . . . shall have general administrative and supervisory powers over all the courts. Such powers shall include the following: . . . (2) Upon written request made by the Chancellor . . . to designate 1 or more of the State Judges . . . to sit in the Court of Chancery . . . and to hear and decide such causes in such Court and for such period of time as shall be designated."). I suggest that not to shirk the work, which is important, challenging, and interesting, but in deference to the superior knowledge that my Superior Court colleagues have regarding criminal matters. Here, having already presided over the injunction hearing, it makes sense to soldier on.

[195] *Rickards v. State*, 77 A.2d 199, 205 (Del. 1950).

determine whether they are consonant or discordant with it."[196]

Two constitutional provisions point in the same direction. Delaware's right-to-a-remedy clause and Delaware's preservation of a separate court of equity indicate that treating the Cruel Punishment Clause as self-executing fits harmoniously within Delaware's constitutional framework. So does Delaware's tradition of permitting direct enforcement of constitutional provisions.

### a. The Right-To-A-Remedy Clause

Article I, Section 9 of the Delaware Constitution grants every citizen a right to a remedy for harm suffered. It states:

> All courts shall be open; and every individual for an injury done to the individual's reputation, person, or movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense. Suits may be brought against this State, according to such regulations as shall be made by law.[197]

The constitutional commitment that "every individual for an injury done to the individual[] . . . shall have remedy" is Delaware's Right-to-a-Remedy Clause.[198]

The Right-to-a-Remedy Clause has its origins in Magna Carta.[199] Sir Edward

---

[196] *Higgin*, 295 A.3d at 1097.

[197] Del. Const. art. I, § 9.

[198] The first clause of the section is the Open Courts Clause. *See* Holland, *supra*, at 64–65 (explaining origins and purpose of clause).

[199] Chapter 29 of the 1225 version of Magna Carta states: "N[o] freeman shall be taken or imprisoned or disseised of any freehold, or liberties, or free customs, or outlawed, or banished, or in any other way destroyed, nor will we go upon him, nor

Coke championed Magna Carta as the root from which "many fruitfull branches of the law of England have sprung," including the protection of individuals from official acts of oppression.[200] He interpreted Magna Carta as standing for the proposition that

> every subject of this realm, for injury done to him in goods, lands, or person, by any other subject, be he ecclesiastical, or temporall, . . . or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay.[201]

Delaware's 1776 Declaration of Rights contained language modeled on Coke's formulation.[202]

In the eighteenth century, Sir William Blackstone described the right to a remedy as one of the subordinate rights by which a civilized society preserved the three absolute rights of personal security, personal liberty, and private property.[203] Those rights existed in the state of nature. Once humans formed into societies, individuals required means of protecting their absolute rights. The right to a remedy

---

send upon him, except by the legal judgment of his peers or by the law of the land. To no one will we sell, to no one will we deny, or delay right or justice." Thomas R. Phillips, *The Constitutional Right to a Remedy*, 78 N.Y.U. L. Rev. 1309, 1310 n.4 (2003).

[200] *Id.* at 1320.

[201] *Id.* at 1320–21 (alteration omitted).

[202] 1776 Declaration of Rights § 12 ("That every freeman for every injury done him in his goods, lands or person, by any other person, ought to have remedy by the course of the law of the land, and ought to have justice and right for the injury done to him freely without sale, fully without any denial, and speedily without delay, according to the law of the land.").

[203] Phillips, *supra*, at 1321–22.

was one of the five subordinate rights that "serve principally as outworks or barriers to protect and maintain inviolate the three great and primary rights."[204] Once a person suffered injury, the right to an "adequate remedy" immediately attached, although judicial process might be necessary to enforce the right.[205] Common law courts stood ready to exercise jurisdiction over all cases involving injury to absolute rights, "[f]or it is a settled and invariable principle in the laws of England, that every right when withheld must have a remedy, and every injury its proper redress."[206]

This history has particular significance for Delaware's provision. Thomas McKean and George Read served as two of the principal drafters of the Delaware Constitution of 1776 and the Delaware Declaration of Rights.[207] They had studied the English common law with John Dickinson at the Middle Temple in London as contemporaries of William Blackstone.[208] The Delaware Constitution of 1776 included both a provision specifically adopting the existing common law of England[209] and a right-to-a-remedy provision based on Coke's formulation. Dickinson presided over the convention that drafted the 1792 Delaware Constitution, which revised

---

[204] *Id.* at 1322 (quoting 1 William Blackstone, *Commentaries on the Laws of England* 141 (Christian ed. 1822)).

[205] *Id.*

[206] *Id.* (quoting Blackstone, *supra*, at 109).

[207] Holland, *supra*, at 65.

[208] *Id.*

[209] *Id.* at 66.

Article I, Section 9.[210] As Justice Holland explained, "It is logical to infer, in the absence of any provisions to the contrary, that John Dickinson and the other framers of Delaware's 1792 Constitution intended to continue the common law principle that there must be a remedy for the violation of any vested right."[211]

Similar provisions now appear in the constitutions of forty states,[212] but courts have reached disparate results when applying them.[213] For its part, the Delaware Supreme Court has given our Right-to-a-Remedy Clause meaningful content.

> It is the duty of the courts to afford a remedy and redress for every substantial wrong. Part of our basic law is the mandate that "every man for an injury done him in his . . . person . . . shall have remedy by the due course of law . . . ." Neither volume of cases, nor danger of fraudulent claims, nor difficulty of proof, will relieve the courts of their obligation in this regard.[214]

The justices admonished that "if there be increased litigation, the courts must willingly cope with the task."[215] The justices also noted that Delaware courts were

---

[210] *Id.* at 65.

[211] *Id.* at 66–67.

[212] Phillips, *supra*, at 1311–12.

[213] *Id.* at 1314 (describing the variation among outcomes as "essentially inexplicable").

[214] *Robb v. Pa. R.R. Co.*, 210 A.2d 709, 714 (Del. 1965) (citation omitted); *accord* Holland, *supra*, at 65 ("Under this Section, the courts have a duty to afford a remedy for every substantial wrong; the volume of cases, danger of fraudulent claims, or difficulty of proof do not eliminate this requirement.").

[215] *Robb*, 210 A.2d at 714.

capable of addressing "illusory and fictional claims."[216] To be sure, the Delaware Supreme Court has held that the Right-to-a-Remedy Clause does not require the courts to invent a common law cause of action otherwise unknown to the common law,[217] but that admonition does not apply when a constitutional provision establishes the governing rule.

The Right-to-a-Remedy Clause suggests that enforcing the Cruel Punishment Clause through injunctive relief is consistent with the scheme of rights established by Delaware's constitution as a whole.

### b. The Constitutional Grant Of Equitable Jurisdiction

Another significant provision is Delaware's constitutional preservation of a Court of Equity. Delaware's colonial courts exercised equity jurisdiction under a statute known as the Gordon Act.[218] Article XIII of the Delaware Constitution of 1776 carried forward that equitable jurisdiction but did not establish a separate Court of Chancery.[219] Article VI, Section 1 of the Delaware Constitution of 1792 established the Court of Chancery and Article VI, Section 14 vested it with exclusive equity jurisdiction,[220] measured by "the general equity jurisdiction of the High Court of

---

[216] *Id.*

[217] *Alfree v. Alfree*, 410 A.2d 161, 163 (Del. 1979), *abrogated on the merits by Beattie v. Beattie*, 630 A.2d 1096 (Del. 1993).

[218] Holland, *supra*, at 155.

[219] *Id.*

[220] *Id.*

Chancery of Great Britain as it existed prior to the separation of the colonies."[221] By doing so, the drafters "intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity."[222] The Delaware Constitutions of 1831 and 1897 preserved the Court of Chancery and its equitable jurisdiction.[223] During the Convention of 1897, there was a lengthy debate about whether a separate court of equity should continue to exist at a time when other jurisdictions were merging their court systems, but the delegates chose to preserve the Court of Chancery as a separate court of equity.[224]

The power of a court of equity to hear claims has always been and necessarily remains broad and flexible. "Historically, equity jurisdiction has taken its shape and its substance from the perceived inadequacies of the common law and the changing demands of a developing nation."[225] To administer a system of equity,

> the Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the

---

[221] *DuPont*, 85 A.2d at 727.

[222] *Id.* at 729.

[223] Holland, *supra*, at 155–56.

[224] *Id.* at 156.

[225] *Schoon*, 953 A.2d at 204 (internal quotation marks omitted).

relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief.[226]

The Court of Chancery thus "has an expansive power, to meet new exigencies"[227] and "to meet changing needs."[228]

One of the maxims of equity is that equity will not suffer a wrong without a remedy.[229] Delaware's preservation of the Court of Chancery as a separate court of equity capable of exercising its powers to address new circumstances suggests that enforcing the Cruel Punishment Clause through equitable relief fits harmoniously with the scheme of rights established by Delaware's constitution as a whole.

### c. A Tradition Of Permitting Actions To Enforce The Delaware Constitution

Delaware's tradition of permitting private parties to enforce provisions in the Delaware Constitution provides additional evidence that treating the Cruel Punishment Clause as self-executing fits harmoniously with Delaware's constitutional scheme. Examples abound:

- Article I, Section 1: In *COVID-Related Restrictions on Religious Services*,[230] religious leaders sued the Governor, challenging emergency COVID-19

---

[226] *Id.* at 204–05 (quoting 1 *Pomeroy's Equity Jurisprudence* § 60, at 77–78 (5th ed. 1941)).

[227] *Id.* at 206 (quoting *Story's Equity Jurisprudence* n.5, at 45 (9th ed. 1866)).

[228] *Id.* at 205 n.24 (quoting Pomeroy, *supra*, § 60, at 77–78).

[229] *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, at v (2d ed. 2019) (listing "THE MAXIMS OF EQUITY").

[230] *COVID-Related Restrictions*, 326 A.3d at 626.

restrictions limiting the number of people who could gather in houses of worship as violating their right to religious freedom under Article I, Section 1. The justices denied the relief sought on justiciability and immunity grounds.

- Article I, Sections 4, 7, 8, and 9: In *Swan Energy*,[231] four individuals sued the Investor Protection Unit of the Delaware Department of Justice, challenging its administrative enforcement action against them for securities fraud and the unlawful sale of unregistered securities, and the statute authorizing the action, as violating their right to a jury trial under Article I, Section 4 and their due process rights under Article I, Sections 7, 8, and 9. No one argued that a private right of action did not exist. The justices denied relief sought on the merits for the trial-by-jury claim and on ripeness grounds for the due process claim, without questioning whether there was a private right of action.

- Article I, Section 7: In *Jannuzzio*,[232] real estate owners sued the Directors and the Superintendent of Public Safety, the Chief of Police, and the Captain of Police of Wilmington, challenging a statutory amendment permitting police authorities to remove obstructions from buildings believed to be used for gambling purposes. They argued the statute authorized an interference with and a taking of property without providing an opportunity to be heard, in violation of the due process clause of the Delaware Constitution. They sought declaratory and injunctive relief. No one argued that a private right of action did not exist. Chancellor Seitz held that the statutory amendment was unconstitutional because it violated the due process hearing requirement. The court issued a permanent injunction enjoining the defendants from removing, destroying or demolishing, or causing the plaintiff or any other person to remove, destroy, or demolish any portion of the plaintiff's building in reliance on the statutory amendment. The court did not question whether there was a private right of action.

- Article I, Sections 7 and 8: In *Randolph*,[233] a property owner sued the Wilmington Housing Authority, the Mayor, and the City Council, challenging a statute providing for the condemnation of private property for slum clearance and urban redevelopment by private contractors as a taking under Article I, Sections 7 and 8. No one argued that a private right of action did not exist. The Court of Chancery certified the constitutional questions to the Delaware

---

[231] *Swan Energy, Inc. v. Inv. Prot. Unit of the Del. Dep't of Just.*, — A.3d —, 2026 WL 2053613 (Del. July 16, 2026).

[232] *Jannuzzio v. Hackett*, 82 A.2d 730 (Del. Ch. 1951).

[233] *Randolph v. Wilm. Hous. Auth.*, 139 A.2d 476 (Del. 1958).

Supreme Court, which held that the statute was constitutional, without questioning whether there was a private right of action.

- Article I, Sections 7 and 8: In *Delmarva Power & Light Co.*,[234] a private utility company sued the city of Seaford for annexing territory in its service area, which caused customers to switch to the municipal utility. The company challenged the act as a taking for public use without compensation under Article I, Sections 7 and 8. No one argued that a private right of action did not exist. The justices held that the company suffered a compensable taking, granting the relief sought on the merits without questioning whether there was a private right of action.

- Article I, Section 9: In *Sierra Club*,[235] the Sierra Club sued the Delaware Department of Natural Resources and Environmental Control, its secretary, and its deputy secretary, alleging, among other things, that dredging the Assawoman Canal without complying with environmental appeal board orders remanding the dredging permit for a proper cost/benefit analysis violates Sierra Club's procedural due process rights under Article I, Section 9. No one argued that a private right of action did not exist. The justices denied the relief sought on the merits without questioning whether there was a private right of action.

- Article I, Section 20: In *Doe*,[236] two public housing residents sued the Wilmington Housing Authority and its executive director, challenging lease provisions restricting when residents, household members, and their guests may carry and possess firearms in common areas as violating their right to keep and bear arms under Article I, Section 20. No one argued that a private right of action did not exist. The defendants removed the case from the Court of Chancery to federal district court, which found no constitutional violations. On appeal, the Third Circuit certified the constitutional questions to the Delaware Supreme Court, which held that the rules violated Article I, Section 20. The justices did not question whether there was a private right of action.

---

[234] *Delmarva Power & Light Co. v. City of Seaford*, 575 A.2d 1089 (Del. 1990).

[235] *Sierra Club v. Del. Dep't of Nat. Res. & Env't Control*, 919 A.2d 547 (Del. 2007).

[236] *Doe v. Wilm. Hous. Auth.*, 88 A.3d 654 (Del. 2014).

- Article I, Section 20: In *Bridgeville Rifle & Pistol Club*,[237] two gun rights interest groups (the Delaware State Sportsmen Association and the Bridgeville Rifle & Pistol Club, Ltd.) and several of their individual members sued the Department of Natural Resources and Environmental Control and Department of Agriculture, challenging regulations banning firearms in state parks and forests (except for hunting) as violating their right to keep and bear arms under Article I, Section 20. No one argued that a private right of action did not exist. The justices granted the relief sought on the merits without questioning whether there was a private right of action.

- Article II, Section 1: In *Rosenthal*,[238] a chiropractor sued the State Board of Chiropractic Examiners, challenging the statutory procedure by which that board is appointed as violating Article II, Section 1, which provides that the legislative power of the state is vested in the General Assembly. No one argued that a private right of action did not exist. The justices declined to reach the merits on whether the statute was invalid and remanded for further proceedings without questioning whether there was a private right of action.

- Article II, Section 3: In *Cassidy*,[239] individuals hoping to be candidates for public office sued members of the Department of Elections for New Castle County, among others, challenging statutes mandating filing fees from candidates for public office as violating Article II, Section 3 by adding to the exclusive qualifications for office in that constitutional provision. No one argued that a private right of action did not exist. The Court of Chancery certified the constitutional questions to the Delaware Supreme Court, which held that the statutes were constitutional, without questioning whether there was a private right of action.[240]

- Article V, Sections 4 and 4A: In *Higgin*,[241] voters, a political candidate, and a volunteer elections inspector sued the State Election Commissioner and Department of Elections, challenging same-day registration and vote-by-mail

---

[237] *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017).

[238] *Rosenthal v. State Bd. of Chiropractic Exam'rs*, 413 A.2d 882 (Del. 1980).

[239] *Cassidy v. Willis*, 323 A.2d 598 (Del. 1974), *aff'd*, 419 U.S. 1042 (1974).

[240] The Attorney General joined plaintiffs in their contention that the statutes were unconstitutional, *id.* at 602, but the justices did not question whether there was a private right of action.

[241] *Higgin*, 295 A.3d at 1065.

statutes as violating Article V, Sections 4 and 4A, which govern elections and voting. No one argued that a private right of action did not exist. The Court of Chancery held that the plaintiffs failed to prove the same-day registration statute was unconstitutional, but the vote-by-mail statute violated Article V, Section 4A. The court permanently enjoined the defendants from enforcing Delaware statutes allowing mail-in voting, without questioning whether there was a private right of action. On appeal, the justices held that both statutes were unconstitutional and granted the relief sought on the merits, without questioning whether there was a private right of action.

- Article V, Sections 1 and 4A: In *Mennella*,[242] an individual hoping to serve as an elections inspector and a state senator sued the State Election Commissioner and Department of Elections, challenging early-voting and permanent-absentee-voting statutes as violating Article V, Sections 1 and 4A, which govern elections and voting. No one argued that a private right of action did not exist. The justices denied the relief sought on standing grounds because their alleged injury as voters was generalized and insufficient, without questioning whether there was a private right of action.

- Article VIII, Section 1: In *Delaware Public Schools Litigation*,[243] two organizations (Delawareans for Educational Opportunity and the NAACP Delaware State Conference of Branches) sued several Delaware officials, challenging their methodologies for preparing property tax assessments as violating Article VIII, Section 1, which requires all tax to be uniform (the "Uniformity Clause"). After the Court of Chancery held, among other things, that the methodologies violated the Uniformity Clause, the parties reached a settlement during the remedial phase and then the court awarded attorneys' fees and expenses. The county officials appealed the award. No one argued that a private right of action did not exist. The justices reversed the attorneys' fees award and affirmed the uncontested expenses award, without questioning whether there was a private right of action.

- Article VIII, Section 1: In *Newark Property Association*,[244] four organizations (Newark Property Association, Delaware Apartment Association, First State Manufactured Housing Association, and Delaware Hotel & Lodging Association) sued the State, the Governor, the New Castle County Executive, the county's chief financial officer, and six school boards, challenging a house

---

[242] *Albence v. Mennella*, 320 A.3d 212 (Del. 2024).

[243] *Del. Pub. Schs. Litig.*, 312 A.3d 703 (Del. 2024).

[244] *Newark Prop. Ass'n v. State*, 350 A.3d 1224 (Del. 2025) (TABLE).

bill allowing school districts to create temporary split-rate tax assessment systems between residential and non-residential properties as violating the Uniformity Clause. No one argued that a private right of action did not exist. The justices denied the relief sought on the merits without questioning whether there was a private right of action.

- Article VIII, Sections 1 and 4: In *Aetna Casualty & Surety Co.*,[245] insurance companies sued the State Insurance Commissioner, challenging two statutory amendments providing for an increase in the tax rate on gross premiums of fire insurance companies to increase funds available for the firemen's pension fund and volunteer fire companies and of general insurance companies to augment police pension systems throughout the state. They argued the amendments violated the Uniformity Clause and Article VIII, Section 4 because they appropriated public money to counties and municipalities and a corporation and were not passed by three-fourths of the members of each house of the General Assembly. They sought a declaratory judgment and a preliminary injunction. The Court of Chancery issued a preliminary injunction enjoining the Insurance Commissioner from paying the money raised under the amendments to the State Treasurer. The Chancellor then certified the constitutional questions to the Delaware Supreme Court, which held that the statutory amendments violated Article VIII, Section 4, without questioning whether there was a private right of action.

- Article VIII, Section 1, and Article X, Section 1: In *Brennan*,[246] a resident and taxpayer sued her district's Board of Education and New Castle County's Board of Assessment and Receiver of Taxes, challenging statutes authorizing the levying of a school tax as violating, among other things, the Uniformity Clause and Article X, Section 1 requiring a uniform system of free public schools. No one argued that a private right of action did not exist. The Court of Chancery certified the constitutional questions to the Delaware Supreme Court, which held that the statute was constitutional, without questioning whether there was a private right of action.

- Article XV, Section 4: In *Stiftel*,[247] eleven Superior Court judges sued the State Treasurer, Secretary of Finance, and other state officials, challenging an amendment to the State Judiciary Pension Act requiring higher deductions from their salaries to contribute to their pension benefits as violating Article

---

[245] *Aetna Cas. & Sur. Co. v. Smith*, 131 A.2d 168 (Del. 1957).

[246] *Brennan v. Black*, 104 A.2d 777 (Del. 1954).

[247] *Stiftel v. Carper*, 378 A.2d 124 (Del. Ch.), *aff'd*, 384 A.2d 2 (Del. 1977).

XV, Section 4, which prohibits reductions of a public officer's salary or emoluments after their appointment. They sought declaratory and injunctive relief. No one argued that a private right of action did not exist. Vice Chancellor Brown held that the statute was unconstitutional as applied to the judicial officers under Article XV, Section 4 because the General Assembly could not diminish their salaries or emoluments after their appointment. The court issued a permanent injunction enjoining the state officials from making the higher deductions from the judges' salaries, without questioning whether there was a private right of action. On appeal, the justices affirmed on the ground that the statute was unconstitutional as applied to the judges under Article XV, Section 4, without questioning whether there was a private right of action.

As these cases show, private individuals have been suing to enforce their state constitutional rights, and Delaware courts, officials, and litigants generally did not consider the concept of a private right of action as a barrier to those lawsuits. These cases are consistent with the presumption that provisions of the Delaware Constitution, and especially provisions of the Bill of Rights, are self-executing. These cases indicate that treating the Cruel Punishment Clause the same way fits harmoniously with the scheme of rights established by Delaware's constitution as a whole.

### 5. Is There An Alternative Enforcement Mechanism That Is Constitutionally Adequate?

The final step in the Suggested Test's analysis for purposes of injunctive relief is to evaluate whether a constitutionally adequate enforcement mechanism already exists. A court should proceed differently depending on whether (1) no remedial scheme exists, (2) a common law remedy but no statutory remedial scheme exists, (3) a statutory remedial scheme exists that is not expressly exclusive or does not otherwise preempt constitutional claims, or (4) a statutory scheme exists that is expressly exclusive.

97

Here, no statutory scheme exists under which prisoners can obtain the equivalent of an injunction enforcing the Cruel Punishment Clause. The Department has an internal prisoner grievance procedure governed by its Policy 4.4, but that scheme is neither statutory nor regulatory nor exclusive.[248] It is a bureau-level procedure that the Commissioner oversees as a matter of policy, subject to limited oversight by the Adult Correction Healthcare Review Committee.[249]

An individual prisoner who suffered injury might be able to sue after the fact for battery[250] or gross negligence, but that type of individual common law action is

---

[248] It is a mandatory first step: A prisoner cannot file a complaint relating to a condition of confinement without fully exhausting all administrative remedies through the internal grievance procedure. 10 *Del. C.* § 8804(g) ("A prisoner may not bring or file a complaint relating to a condition of confinement, whether proceeding in forma pauperis or otherwise, unless the prisoner has fully exhausted all administrative remedies available through the institutional grievance procedure. The fact that monetary damages or any other form of legal or equitable relief may not be available through the grievance procedure shall not excuse the inmate from exhausting the institutional grievance procedure prior to filing a complaint."). The Commissioner did not raise the failure to exhaust administrative remedies as a defense, likely because all but two of the plaintiffs satisfied that requirement.

[249] 11 *Del. C.* § 6518(n)(4) (providing that the committee shall "[r]eceive and review monthly summaries of inmate, staff, public, and other health-care related grievances and the resolutions of these grievances in order to be fully appraised of the state of health-care services in Delaware's adult correction facilities"); *id.* § 6518(p) (providing that the committee "shall refer to the appropriate licensing board grievance cases in which there is a serious deviation from the community standard of care by a health-care worker or other employee of a prison health-care contractor, if the health-care worker or other employee's profession or occupation is governed under Title 24.").

[250] *See In re Taylor v. Barwick*, 1997 WL 527970, at *4 (Del. Super. Jan. 10, 1997) (denying correction officer's motion for summary judgment on battery claim while limiting prisoner to nominal damages).

not an adequate substitute for forward-looking injunctive relief. A forward-looking injunction can prevent or at least reduce the risk of serious harm or death. A backward-looking damages remedy cannot.[251] Moreover, a constitutional guarantee like the Cruel Punishment Clause goes beyond the private interests that common law torts protect. The Cruel Punishment Clause and other provisions in the Delaware Constitution serve "to limit the sovereign power" of the state and as a guarantee of fundamental rights.[252] A common law tort claim does not adequately remedy the

---

[251] *See Lyons*, 461 U.S. at 137 (Marshall, J., dissenting) (observing that under the majority's view, federal courts cannot issue "an order to cease the unconstitutional practice, but only an award of damages to those who are victimized by the practice and live to sue and to the survivors of those who are not so fortunate"); *id.* ("The federal judicial power is now limited to levying a toll for such a systematic constitutional violation."); *Lankford v. Gelston*, 364 F.2d 197, 202 (4th Cir. 1966) ("[T]he lesson of experience is that the remote possibility of money damages serves as no deterrent to future police invasions.") (citing *Mapp v. Ohio*, 367 U.S. 643, 651–52 (1961)); *The Supreme Court, 1982 Term*, 97 Harv. L. Rev. 215, 219 n.37 (1983) ("The Court's assumption that suits for damages vindicate constitutional rights effectively is questionable for several reasons. First, certain kinds of civil rights violations, such as illegal searches, are almost never litigated, and they are even less likely to be litigated if no possibility exists of obtaining an injunction. Second, a judgment in an individual case that a particular practice is unconstitutional cannot be used by a similarly situated plaintiff unless she files her own suit for damages. By comparison, an injunction can be more quickly enforced through contempt proceedings. Third, even if there were adequate incentive to litigate all constitutional infringements through damage actions, and even if claims could be heard expeditiously, the typical judgment in such actions would have little deterrent effect on the challenged conduct." (citations omitted)); Myriam E. Gilles, *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights*, 100 Colum. L. Rev. 1384, 1399 (2000) ("Many scholars have made the point that damages remedies have proven ineffective in deterring systemic police misconduct." (collecting scholarship)).

[252] *See Jones v. State*, 745 A.2d 856, 864 (Del. 1999) (the Delaware Constitution "serves only to limit the sovereign power which inheres directly in the people and

deprivation of a constitutional right.

An individual who is convicted of a crime and sentenced can rely on the Cruel Punishment Clause to challenge their sentence, whether on appeal, under Superior Court Criminal Rule 35, or Superior Court Criminal Rule 61.[253] Invocations of the Cruel Punishment Clause have commonly taken those forms.[254] Those avenues do not

---

indirectly in their elected representatives . . . . [T]he explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them").

[253] Rule 35(a) permits the court to "correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence." Super. Ct. Crim. R. 35(a). Rule 61 governs an application by a person in custody to set aside a conviction or sentence of death. *Id.* 61.

[254] *See, e.g., Burrell v. State*, 207 A.3d 137 (Del. 2019) (challenging thirty-seven year sentence for juvenile under Cruel Punishment Clause); *Thomas v. State*, 55 A.3d 839 (Del. 2012) (challenging twenty-five year sentence, which exceeded sentencing guidelines, under Cruel Punishment Clause); *Wallace v. State*, 956 A.2d 630, 631 (Del. 2008) (challenging sentence of life without parole under Cruel Punishment Clause); *Dawson v. State*, 673 A.2d 1186 (Del. 1996) (challenging death sentence under Cruel Punishment Clause); *State v. Deputy*, 644 A.2d 411 (Del. Super.) (challenging method of death sentence by lethal injection under Cruel Punishment Clause), *aff'd*, 648 A.2d 423 (Del. 1994); *Wright*, 633 A.2d at 329 (challenging death sentence under Cruel Punishment Clause); *Sanders*, 585 A.2d at 117 (seeking reversal of criminal conviction and sentence, and challenging death sentence under Cruel Punishment Clause); *Ayers*, 260 A.2d at 162 (challenging sentence under statutory mandatory minimum under Cruel Punishment Clause); *Cannon v. State*, 196 A.2d 399, 400 (Del. 1963) (individual "filed a motion under Rule 35(a) for the correction of an illegal sentence on the ground that the imposition of lashes as a penalty for crime was cruel and thus prohibited by the Delaware Constitution and the Eighth Amendment to the United States Constitution"); *Cannon*, 190 A.2d at 514 (challenging sentence carrying penalty of lashes under Cruel Punishment Clause); *State v. Desmond*, 2024 WL 3456225 (Del. Super. July 16, 2024) (filing motion under Rule 35(b) for the reduction of seventy-eight year sentence, challenging it under Cruel Punishment Clause); *State v. Jones*, 2004 WL 2190097 (Del. Super. Aug. 31, 2004)

provide a vehicle for challenging prison conditions. The state writ of habeas corpus is not available for that purpose.[255]

Because no remedial scheme exists, there is no risk of transgressing the separation of powers. In this setting, a court can enforce the constitutional provision if warranted.[256]

### 6. Addressing The *Schueller* Line Of Cases

To defeat a private right of action, the Commissioner relies heavily on *Schueller* and the cases that followed it. Those decisions do not foreclose recognizing a private right of action for injunctive and declaratory relief. They are also not persuasive on that point.

*Schueller* cited a series of reasons for not recognizing a cause of action for

---

(challenging death sentence for juvenile under Cruel Punishment Clause); *State v. Archie*, 2002 WL 1922466 (Del. Super. Aug. 12, 2002) (challenging forty-eight year sentence under Cruel Punishment Clause).

[255] *See Earl v. Emig*, 349 A.3d 1151 (Del. 2025) ("[T]he writ of habeas corpus under Delaware law provides relief on a very limited basis. Specifically, it provides an opportunity for an illegally confined or incarcerated person to obtain judicial review only of the jurisdiction of the court ordering the commitment. When the commitment is regular on its face and the court has jurisdiction over the subject matter, habeas corpus does not afford a remedy to the petitioner." (quoting *Hall v. Carr*, 692 A.2d 888, 891 (Del. 1997)) (alteration in original and internal quotation marks omitted)).

[256] The prisoners may have rights of action under federal law. The question here is whether the prisoners can sue as a matter of Delaware law, or whether other aspects of Delaware law already provide an adequate remedy.

money damages under Article I, Section 6 of the Delaware Constitution.[257] *Schueller* first held implicitly that the language of the constitutional provision did not support a private right of action for damages.[258] This decision has explained why the Cruel Punishment Clause is self-executing and is enforceable for purposes of injunctive and declaratory relief.

*Schueller* next held implicitly that the constitutional provision did not sufficiently define the contours of the requested private right of action[259] and noted the lack of any state statute resembling federal Section 1983 that could define the scope and limits of the claim.[260] But like a constitutional provision, Section 1983 is broad and non-specific.[261] Regardless, this decision has shown that Delaware courts

---

[257] *See* Del. Const. art. 1, § 6 ("The people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.").

[258] *Schueller*, 2017 WL 568344, at *2 (noting that "Article I, Section 6 . . . does not mention excessive force").

[259] *Id.* (observing that Article I, Section 6 "does not mention . . . the requirements for bringing such a cause of action" and the claim would "lack defined boundaries").

[260] *Id.* (observing that "there is no state statute similar to section 1983 of the Civil Rights Act that already exists to define the scope of this new cause of action and its limits").

[261] 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

have permitted suits to enforce constitutional provisions, even when those provisions established broad constitutional mandates. This decision has also shown that Delaware decisions treat the Cruel Punishment Clause as having self-executing content.

*Schueller* ultimately declined to act based on separation of powers concerns.[262] As this decision has shown, that reasoning approaches the problem from the wrong perspective. The Delaware Supreme Court has made clear that a court has "no choice but to use every means at [its] disposal to preserve those guarantees."[263] The fact that the legislature has not created an adequate remedy for a constitutional right provides a reason for the court to act, not a reason for inaction. In addition to enforcing the constitutional right, judicial action may prompt the legislature to

---

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."). Nor was it inevitable that Section 1983 would emerge as the principal federal vehicle for civil rights litigation. Congress passed Section 1983 in 1871 as part of the Civil Rights Act to protect freedmen from the Ku Klux Klan and corrupt state and local officials. The statute largely lay dormant until 1961, when the Supreme Court of the United States held that a party could sue a state official directly under Section 1983, even if the party lacked a state remedy. *See Monroe v. Pape*, 365 U.S. 167 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

[262] *Schueller*, 2017 WL 568344, at *2 (reasoning that "the Delaware State Legislature is the entity best suited to create a new cause of action in this instance").

[263] *Rickards*, 77 A.2d at 205.

103

establish a constitutionally adequate statutory scheme.

*Schueller* also held implicitly that there was no need for a private right of action to enforce Article I, Section 6 because common law torts were available.[264] As this decision has explained, a common law damages action is not a substitute for forward-looking injunctive relief enforcing a constitutional right.

Implicitly weighing competing policy interests and resolving them against a private right of action for money damages, *Schueller* cited the threat of potentially ruinous liability.[265] A suit for injunctive relief does not carry the same risks. Moreover, the Delaware Constitution is the state's supreme law. The Delaware Constitution has already conducted the balancing and resolved it in favor of the constitutional right.

For purposes of the claims for injunctive and declaratory relief in this case, *Schueller* is unpersuasive, as are the two Delaware state court cases that tracked its analysis. Three Delaware District Court decisions that relied on *Schueller* to predict that Delaware would reject *any* private right of action under the Cruel Punishment Clause are similarly unpersuasive. *Winter* involved a request for damages and

---

[264] *Schueller*, 2017 WL 568344, at \*2 (noting that the prisoner could pursue a "common law tort action for battery or gross negligence, both of which allow Mr. Schueller the opportunity to recover damages for the unlawful or excessive use of force").

[265] *Id.* (positing that a money damages claim under Article I, Section 6 "could impose huge financial burdens on municipal, local, and state government entities").

tracked *Schueller*'s analysis almost verbatim.[266] Two later decisions involved requests for damages and injunctive relief, yet they did not distinguish between the two. Both relied on *Winter* and the Delaware state court cases to hold that Delaware would not recognize any private right of action under the Cruel Punishment Clause.[267] For purposes of a suit seeking injunctive and declaratory relief, this decision cannot agree.

## V.    CONCLUSION

The plaintiffs have standing to seek injunctive relief. Their request for a declaratory judgment is ripe. A private right of action exists under the Cruel Punishment Clause that can support injunctive or declaratory relief. The Department's requests for dismissal on the basis of those arguments are denied.

---

[266] *See Winter v. Richman*, 2020 WL 6940760, at *2 (D. Del. Nov. 25, 2020) (involving requests for damages, declaratory, and injunctive relief).

[267] *See Rogers v. Mears*, 2025 WL 3199161, at *7–8 (D. Del. Nov. 17, 2025) (involving requests for damages, declaratory, and injunctive relief); *Evans v. Dematteis*, 2024 WL 1885554, at *11 (D. Del. Apr. 30, 2024) (involving requests for damages and injunctive relief).